*** NOT FOR PUBLICATION IN WEST'S HAWAII REPORTS AND PACIFIC REPORTER ***

NO. 28571

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Respondent-Plaintiff-Appellee,

vs.

ARTHUR VINHACA, Petitioner-Defendant-Appellant

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(FC-CR. NO. 06-1-0088)

MEMORANDUM OPINION
(By: Moon, C.J., Nakayama, Duffy and Recktenwald, JJ.
and Acoba, J., Dissenting)

Petitioner-Defendant-Appellant Arthur Vinhaca

("Vinhaca") filed a timely application for a writ of certiorari

seeking review of the judgment of the Intermediate Court of

Appeals (ICA) filed May 22, 2009, entered pursuant to the summary

disposition order filed April 29, 2009 in State v. Vinhaca, No.

28571 (App. Apr. 29, 2009) (SDO) which affirmed the April 30,

2007 judgment of the circuit court of the fifth circuit.[1]  This

court accepted certiorari on September 30, 2009, and oral

argument was held on November 19, 2009.  Vinhaca asserts that the

ICA gravely erred by affirming the circuit court's decision to

allow the introduction of preliminary hearing testimony after

holding that one of the witnesses was unavailable.[2]  For the

_____

[1]     The Honorable Kathleen N.A. Watanabe presiding.

[2]     Vinhaca also asserts that he did not have an adequate opportunity
to cross-examine his unavailable daughter and that the prosecutor committed
                                                        continue...

following reasons, we affirm the ICA's May 22, 2009, judgment on appeal.

## I. BACKGROUND

The State of Hawai'i ("the prosecution") charged Vinhaca with nine counts of Sexual Assault in the Third Degree in violation of Hawai'i Revised Statutes (HRS) § 707-732 (Supp. 2008),[3] one count of Assault in the Second Degree in violation of HRS § 707-711(1)(d) (1993),[4] five counts of Abuse of Family and

---

[2]...continue
prosecutorial misconduct. Upon careful review of the record and the briefs submitted by the parties, we conclude that these arguments are without merit.

[3]     HRS § 707-732 provides in relevant part:

> (1) A person commits the offense of sexual assault in the third degree if:
>         . . . .
>         (b) The person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person;
>         (c) The person knowingly engages in sexual contact with a person who is at least fourteen years old but less than sixteen years old or causes the minor to have sexual contact with the person; provided that:
>             (i) The person is not less than five years older than the minor; and
>             (ii) The person is not legally married to the minor[.]

[4]     At the time of the charged offense, HRS § 707-711(1)(d) provided in relevant part:

> (1) A person commits the offense of assault in the second degree if:
>         . . . .
>         (d) The person intentionally or knowingly causes bodily injury to another person with a dangerous instrument[.]

Household Members in violation of HRS § 709-906 (Supp. 2009),[5] and two counts of Sexual Assault in the First Degree in violation of HRS § 707-730(1)(b) (Supp. 2008),[6] arising from Vinhaca's alleged abuse of his two minor daughters, Daughter 1 and Daughter 2, between 2003 and 2005. Both Daughters testified at the preliminary hearing, but only Daughter 2 appeared at trial.

The daughters testified at the July 25, 2007 preliminary hearing as follows. Daughter 2 testified that when she was fourteen, Vinhaca touched her breasts and her "private parts." She testified Vinhaca used to "twist [her] nipples" with his hand and "used to make [his daughters] whistle and he wouldn't want to stop until [they] whistle[d]." Rebecca Seiter, Daughter 2's therapist, testified that Daughter 2 told her Vinhaca "often did that when he was upset with [Daughter 2's] mother, so that she would hear the whistle and know that her daughter was being hurt or touched." This happened "about three times a week" when Daughter 2 was fourteen. She also testified

---

[5] HRS § 709-906(1) provides:

> (1) It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member .
> . . .

[6] HRS § 707-730(1)(b) provides:

> (1) A person commits the offense of sexual assault in the first degree if:
> ....
> (b) The person knowingly engages in sexual penetration with another person who is less than fourteen years old[.]

3

that Vinhaca touched and rubbed her vagina through her clothes and sucked her breasts. Vinhaca "would make [her] lay inside the bed with him" and would rub her vagina with his penis through her clothes. He also hit her over the head with a large steel wrench because she did not clean his tools well enough.

Daughter 1 testified that, when she was eleven, Vinhaca would pinch her nipples until she whistled to stop. This happened "every day" until she moved out of Vinhaca's house. She also testified that Vinhaca touched and rubbed her vagina with his hand and would undress, lay on her, and touch his penis to her vagina. She testified that "two or three times" he put his penis into her vaginal opening. She also testified that he put his fingers in her genital opening, and put his mouth on her genital opening.

On January 22, 2007, the prosecution moved to sever the trial because it could not locate Daughter 1. The declaration of the prosecuting attorney stated that in "preparing for this trial, Counsel learned that [Daughter 1] is on runaway status." The declaration also stated that "[a]s of now, it is doubtful that [Daughter 1] will be available for trial on February 5, 2007."

On February 1, 2007, the circuit court held a hearing on the prosecution's motion to sever. At the hearing, the

prosecuting attorney stated:

> THE COURT: Okay. And, once again, the basis of this motion is the problem with a witness, with the complaining witness.
> [PROSECUTING ATTORNEY]: Yes, and so your Honor is up to date on that issue, we did -- the witness that we're having difficulty with is a minor. <u>We have actually served the guardian with a subpoena to bring that minor to court. However, we have been informed that she is not being [sic] able to be located right now.</u>
> We have an understanding where she is, but it appears that she's kind of in hiding. <u>We have had our investigator go out and try to find her himself</u>, but for your Honor's knowledge, we have actually served the person we needed to serve, which is the CWS . . . worker.

The motion to sever was denied and Vinhaca's trial began on February 5, 2007. Daughter 1 did not appear at trial, and Daughter 2 essentially recanted the testimony she had given at the preliminary hearing. The prosecution requested that the circuit court play the tape of Daughter 2's preliminary hearing testimony for the jury. The circuit court granted this request and Daughter 2's preliminary hearing testimony was played for the jury.

After Daughter 2's preliminary hearing testimony was played, Karla Huerta ("Huerta"), a social services worker for the Department of Human Services ("DHS") testified about the efforts made to locate Daughter 1. She testified that on January 25, 2007, she was served with a subpoena "to bring [Daughter 1] to court for this trial[.]" She testified that she was unable to bring Daughter 1 to trial because Daughter 1 was "on the run." Daughter 1 first ran away on October 31, 2006, and "has been

5

picked up on four different occasions, but has continued to run away from the program." Daughter 1 was "last picked up on January 16th, and then she ran away within an hour of that time."

Huerta testified that in the several days before trial she contacted the "juvenile delinquent program to help see if they've heard of anything" and that they "printed something in the newspaper." She went to Daughter 1's mother's home, where Daughter 1 has resided on numerous occasions, "contacted the schools[,]" and talked to "many people in the community" including police officers. She called police officers to see if they have "seen or heard of her recently because of this court hearing." On cross-examination, she testified that when the sheriff served her, she told him that Daughter 1 was not with her. She also testified that prior to being served, she could not locate Daughter 1.

The prosecution then requested that the circuit court play the tape of Daughter 1's preliminary hearing testimony for the jury. The circuit court granted the request over the objection of the defendant.

At the close of trial, upon agreement by the prosecution and Vinhaca, the circuit court dismissed five counts. The jury found Vinhaca guilty of one count of first-degree sexual assault, in violation of HRS § 707-730(1)(b) (Supp. 2008); one

count of first-degree attempted sexual assault, in violation of HRS §§ 707-730(1)(b) and 705-500 (1993); one count of second-degree assault, in violation of HRS § 707-711(1)(d) (1993); and eight counts of third-degree sexual assault, in violation of HRS § 707-732 (Supp. 2008).

Vinhaca appealed to the ICA asserting that the circuit court's decision to allow the introduction of Daughter 1's preliminary hearing testimony violated the Confrontation Clause because the prosecution failed to prove Daughter 1's unavailability. The ICA concluded that "the admission of Daughter 1's preliminary hearing testimony did not violate Vinhaca's right of confrontation." Vinhaca, SDO at 4. The ICA held that the "circuit court did not err in finding that Daughter 1 was unavailable" because the "State presented evidence that it had served Daughter 1's legal custodian, Karla Lynn Huerta, a social worker for the Department of Human Services, with a subpoena to bring Daughter 1 to trial." Id. at 5. The ICA also relied on Huerta's testimony "that she was unable to comply with the subpoena because Daughter 1 had run away and Daughter 1's whereabouts were unknown." Id. The ICA noted that Daughter 1 ran away three weeks before trial and that Huerta had been unable to locate Daughter 1. Id. Huerta was unable to locate Daughter 1 "despite efforts that included providing pictures of Daughter 1

to the juvenile delinquency program and having them publish a request for assistance in locating Daughter 1 in a newspaper; looking for Daughter 1 at her mother's home; and contacting Daughter 1's school, people in the community, and the police in an effort to ascertain her whereabouts." Id. The ICA concluded that the circuit court did not err in finding that Daughter 1 was unavailable, and affirmed the April 30, 2007, judgment of the circuit court. Id. at 7.

## II. STANDARDS OF REVIEW

### A. Certiorari

The acceptance or rejection of an application for writ of certiorari is discretionary. HRS § 602-59(a) (Supp. 2009). "In deciding whether to accept an application, this court reviews the decisions of the ICA for (1) grave errors of law or of fact or (2) obvious inconsistencies in the decision of the ICA with that of the supreme court, federal decisions, or its own decisions and whether the magnitude of such errors or inconsistencies dictate the need for further appeal." State v. Wheeler, 121 Hawai'i 383, 390, 219 P.3d 1170, 1177 (2009) (citing HRS § 602-59(b)).

### B. Violation of Right To Confrontation

Whether the prosecution has adequately shown "the 'unavailability' of a witness-for the purpose of satisfying the

confrontation clauses of the United States and Hawai'i Constitutions-is, at the first level of analysis, a question of fact for the trial court to decide, involving a determination of the nature of the prosecution's 'good faith' efforts to secure the witness's presence at trial." State v. Lee, 83 Hawai'i 267, 273, 925 P.2d 1091, 1097 (1996). Findings of fact are reviewed under the clearly erroneous standard. Id. (citing State v. Ganal, 81 Hawai'i 358, 368, 917 P.2d 370, 380 (1996); Tachibana v. State, 79 Hawai'i 226, 231, 900 P.2d 1293, 1298 (1995); State v. Furutani, 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994)). A finding of fact is clearly erroneous when "despite evidence to support the finding, the appellate court is left 'with the definite and firm conviction that a mistake has been committed.'" Id. (quoting Ganal, 81 Hawai'i at 368, 917 P.2d at 380; Tachibana, 79 Hawai'i at 231, 900 P.2d at 1298; Furutani, 76 Hawai'i at 179, 873 P.2d at 58).

"At the second level of analysis, we ask whether the facts as found amount to a legally adequate good faith effort to confront the defendant with his accusers. This is a question of federal and/or state constitutional law, and we answer it by exercising our own 'independent constitutional judgment [based] on the facts of the case.'" Id. (some internal quotation marks omitted) (quoting Crosby v. State Dep't of Budget & Fin., 76

Hawai'i 332, 341, 876 P.2d 1300, 1309 (1994)). "In other words, 'application of constitutional principles to the facts as found . . . requires us to examine the entire record and make an independent determination . . . based upon that review and the totality of the circumstances[.]'" Id. (quoting State v. Hoey, 77 Hawai'i 17, 32, 881 P.2d 504, 519 (1994)).

## III. DISCUSSION

### A. The ICA Did Not Gravely Err By Affirming the Trial Court's Determination That Daughter 1 Was Unavailable.

In his application, Vinhaca asserts that the ICA gravely erred by holding that Daughter 1 was unavailable for trial. He asserts that the admission of prior testimony violated the Confrontation Clause.[7]

Preliminary hearing testimony from an unavailable witness is testimonial hearsay. State v. Fields, 115 Hawai'i 503, 513, 168 P.3d 955, 965 (2007) (quoting Crawford v. Washington, 541 U.S. 36, 64, 68 (2004)). Testimonial hearsay "is admissible 'only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine'

---

[7] In his application, Vinhaca did not specify which constitution his confrontation claim is based upon. This court has stated that the "confrontation clause contained within article I, section 14 of the Hawai'i Constitution is virtually identical to the confrontation clause of the sixth amendment to the United States Constitution." State v. Fields, 115 Hawai'i 503, 517, 168 P.3d 955, 969 (2007). However, in State v. Lee, 83 Hawai'i 267, 278, 925 P.2d 1091, 1102 (1996), this court adopted a test for unavailability not yet endorsed by the United States Supreme Court. As discussed below, we conclude that under either test, the admission of Daughter 1's preliminary hearing testimony did not violate Vinhaca's right to confront Daughter 1.

10

[the declarant] about the statement." Id. (quoting Crawford, 541 U.S. at 59).

In determining whether the declarant is unavailable, the United States Supreme Court has held that the prosecution must prove that it made a "good faith" effort to secure the presence of the unavailable witness. Ohio v. Roberts, 448 U.S. 56, 74 (1980) (quoting Barber v. Page, 390 U.S. 719, 724-25 (1968)), overruled on other grounds by Crawford, 541 U.S. at 60-61, 68-69. The State's obligation to make a good faith effort is "context-specific . . . ." Hamilton v. Morgan, 474 F.3d 854, 858-59 (6th Cir. 2007); see also 30B Michael Graham, Federal Practice & Procedure § 7072 at 736-40 (2006) ("Whether the government has shown good faith in attempting to first locate and second procure the witness' attendance by process or voluntarily by reasonable means must be determined on a case-by-case basis after careful review of the particular facts and circumstances.") (emphasis added) (footnotes omitted). For instance, the Supreme Court explained that:

> The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation.

Roberts, 448 U.S. at 74 (emphasis in original).

The Supreme Court also emphasized that the "lengths to

which the prosecution must go to produce a witness . . . is a question of reasonableness." Id. (quoting California v. Green, 399 U.S. 149, 189 n.22 (1970) (Harlan, J., concurring)). To satisfy the unavailability requirement of the United States Constitution, the prosecution must show that "the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." Id. at 74-75.

This court has also explained that a good faith effort requires that the prosecution has made "vigorous and appropriate steps to procure the complaining witness' presence at trial . . . ." State v. Lee, 83 Hawai'i 267, 277, 925 P.2d 1091, 1101 (1996) (emphasis and block format omitted) (quoting State v. Ortiz, 74 Haw. 343, 363, 845 P.2d 547, 556-57 (1993)). In Lee, this court expressly adopted the unavailability standard announced in United States v. Lynch: "establishment of the prosecution's reasonable efforts to secure the presence of the declarant 'require[s] a search equally as vigorous as that which the government would undertake to find a critical witness if it has no prior testimony to rely upon in the event of 'unavailability[.]''" Id. at 278, 925 P.2d at 1102 (relying on United States v. Lynch, 499 F.2d 1011, 1023 (D.C. Cir. 1974)). As discussed below, the prosecution satisfied the tests announced in Roberts and Lee by moving to sever the trial when it became apparent Daughter 1 may

not appear, having an investigator attempt to locate Daughter 1, subpoenaing Huerta to locate Daughter 1, and through Huerta's attempts to locate Daughter 1.

1. <u>The prosecution's efforts to locate Daughter 1 satisfied the Sixth Amendment's unavailability requirement.</u>

The admission of Daughter 1's preliminary hearing testimony into evidence did not violate the Sixth Amendment of the United States Constitution.  In <u>Roberts</u>, the prosecution sought to introduce prior testimony of a witness, Anita Isaacs, and submitted evidence to establish her unavailability.  <u>Roberts</u>, 448 U.S. at 59.  The prosecutor spoke with Anita's mother four months before trial.  <u>Id.</u> at 75.  Anita's mother told the prosecutor that she did not know Anita's location, had last heard from Anita during the preceding summer, and had no way of contacting Anita in an emergency.  <u>Id.</u>  The prosecution issued five subpoenas to Anita's mother in the several months before trial.  <u>Id.</u>  Additionally, at the hearing to determine the admissibility of the preliminary hearing testimony, the prosecutor stated to the court that the defendant "witnessed that I have attempted to locate, I have subpoenaed, there has been a <u>voir dire</u> of the witness' parents, and they have not been able to locate her for over a year."  <u>Id.</u>  Upon review, the Supreme Court held that given "these facts, the prosecution did not breach its

duty of good-faith effort." Id. The Supreme Court held that a conversation with Anita's mother -- where the mother told the prosecutor that she did not know Anita's location -- along with five subpoenas served on Anita's mother at her residence, satisfied the prosecution's burden to show Anita's unavailability.[8] The Court emphasized that

> the service and ineffectiveness of the five subpoenas and the conversation with Anita's mother were far more than mere reluctance to face the possibility of a refusal. It was investigation at the last-known real address, and it was conversation with a parent who was concerned about her daughter's whereabouts.

Id. at 76.

---

[8] The dissent asserts that serving "five subpoenas over a span of several months is evidence that the prosecution remained in contact with Anita's parents and made periodic checks with them to determine if they had any new information on Anita's whereabouts." Dissent at 29 (footnotes omitted). Although the Supreme Court noted that the prosecutor was "in touch with [Anita's mother] and discussed with her Anita's whereabouts[,]" the Supreme Court did not establish that the prosecutor made "periodic checks" with Anita's parents outside of sending subpoenas to their residence. See Roberts, 448 U.S. at 75, 76 ("the service and ineffectiveness of the five subpoenas and the conversation with Anita's mother were far more than mere reluctance to face the possibility of a refusal."). For instance, Justice Brennan's dissenting opinion states that from "all that appears in the record - and there has been no suggestion that the record is incomplete in this respect - the State's total effort to secure Anita's attendance at respondent's trial consisted of the delivery of five subpoenas in her name to her parents' residence, and three of those were issued after the authorities had learned that she was no longer living there." Id. at 79 (Brennan, J., dissenting) (footnote omitted).

Additionally, although the dissent notes that the prosecution conducted a voir dire of Anita's mother in Roberts, Dissent at 28, the voir dire hearing occurred at trial after the prosecutor sought to introduce Anita's preliminary hearing testimony. Roberts, 448 U.S. at 59. The hearing was conducted at defendant's request to establish Anita's unavailability. Id. at 59, 75. Anita's mother was "the sole witness at voir dire" and testified that she "knew of no way to reach Anita in case of an emergency." Id. at 59-60. The voir dire of Anita's mother is analogous to calling Huerta at trial to testify about Daughter 1's unavailability, and is not an additional effort made by the prosecution in Roberts to establish Anita's unavailability.

Applying the Supreme Court's analysis in <u>Roberts</u>, the prosecution in the present matter satisfied its obligation to make a good faith effort. Like the prosecutor in <u>Roberts</u>, the prosecution served a person, Huerta, who was concerned about Daughter 1's whereabouts. For instance, Huerta testified that, prior to being served, she was unable to locate Daughter 1 after she ran away from her placement at the Hale Opio Girls Home Group Program on January 16, 2007. Thus, like Anita's mother, Huerta was concerned about Daughter 1's whereabouts and could not locate Daughter 1.

Additionally, the service of the subpoena on Huerta prompted Huerta to take additional efforts to locate Daughter 1. For instance, Huerta testified that she was served with a subpoena "<u>to bring [Daughter 1] to court for this trial[.]</u>" (Emphasis added.) The subpoena also indicates that Daughter 1 was served "care of" Huerta. In complying with this subpoena, Huerta testified she had been unable to locate Daughter 1 despite contacting the juvenile delinquent program, placing an ad in the newspaper, visiting Daughter 1's mother's home where Daughter 1 had resided on numerous occasions, talking to "many people in the community[,]" and contacting police officers and calling them to "see if they've seen or heard of her recently . . . ." Huerta's efforts met the good faith standard announced in <u>Roberts</u>. We

15

respectfully disagree with the dissent's suggestion that her efforts could not establish a good faith effort to locate Daughter 1 because she was not a "prosecutorial authority." Dissent at 13 (citing Barber, 390 U.S. at 724-25). The efforts of a social worker to locate an unavailable witness can establish that a good faith effort was made to bring the witness to trial. See infra at 21-23.

Finally, unlike Roberts, the prosecution assigned an investigator to locate Daughter 1[9] and moved to sever the trial

---

[9] Although the dissent asserts that "the bare statement that the prosecution had its 'investigator go out and try to find her himself' is manifestly insufficient" to establish that the prosecution made a good faith effort to locate Daughter 1, Dissent at 20, even without this statement, the prosecution established a good faith effort by serving the subpoena on Huerta, having Huerta make numerous efforts to locate Daughter 1, and moving to sever the trial. Additionally, this court can rely upon an undisputed representation by the prosecutor at a hearing to bolster its conclusion that the prosecution made good faith efforts to locate Daughter 1. See Hiler v. State, 796 P.2d 346, 349 (Okla. Crim. App. 1990) (holding that the "prosecution's uncontroverted assertion was sufficient to show that [the witness] was unavailable to testify") (citing Munson v. State, 758 P.2d 324, 333 (Okla. Crim. App. 1988)); Munson, 758 P.2d at 333 (holding that the prosecution established a witness' unavailability partly based on a prosecutor's representation of a conversation with a prosecutor from another state), cert. denied 488 U.S. 1019 (1989).
The dissent distinguishes Hiler by asserting that Hiler waived his confrontation argument by introducing the preliminary hearing testimony in his case in chief. Dissent at 22. Respectfully, this argument is unpersuasive because the court held that "[n]otwithstanding appellant's waiver of these issues, we hold that appellant's right to confrontation was not abridged through the use of [the witness]' preliminary hearing testimony and that the prosecution's uncontroverted assertion was sufficient to show that [the witness] was unavailable to testify." Hiler, 796 P.2d at 349 (emphasis added). Thus, this court can rely on the uncontroverted representation of the prosecutor to establish that it made a good faith effort.
Moreover, although the dissent notes, and we agree, that Munson is factually distinct because the court did not rely solely on the representations of the prosecutor, Dissent at 22-23, the Hiler court interpreted Munson as supporting the proposition that "the prosecution's uncontroverted assertion was sufficient to show that [the witness] was unavailable to testify." Hiler, 796 P.2d at 349 (citing Munson, 758 P.2d at continue...

16

when it became apparent that the prosecution would have difficulty locating Daughter 1 for trial. The prosecution's efforts before trial exceeded the efforts the prosecutors took in Roberts.[10] Thus, under Roberts, the prosecution established

---

[9]...continue

333). Thus, although the dissent correctly observes that Munson is distinct, the Oklahoma Criminal Court of Appeals interpreted Munson as supporting the proposition we use it for. See id.

[10] As the dissent points out, there are factual differences between Roberts and this case. See Dissent at 27-33. For instance, in Roberts, the prosecution served five subpoenas over the course of several months. However, the prosecution served three of these subpoenas after it knew Anita did not reside at her mother's residence. See Roberts, 448 U.S. at 79-80 & n.3 (Brennan, J., dissenting). Returns for the remaining two subpoenas were made on November 3 and November 4, 1975. Id. Thus, although the number of subpoenas issued in Roberts appears to suggest that the prosecutor's efforts in that case outweigh the prosecution's efforts in this case, the prosecution only issued two subpoenas -- one day apart -- at Anita's mother's house before they knew that Anita did not reside with her mother.

Additionally, as the dissent discusses, the subpoena in this case was served after the prosecution had moved to sever the trial based on Daughter 1's unavailability. This does not demonstrate the prosecution's "bad faith" in serving the subpoena, but instead demonstrates that the prosecution served Huerta to prompt her to take additional efforts to locate Daughter 1. This is evidenced by Huerta's testimony that she was served with a subpoena "to bring [Daughter 1] to court for this trial[.]" Furthermore, the prosecution's adherence to a necessary legal process does not indicate that its service of the subpoena was "truly a meaningless exercise, bereft of any good faith basis." Dissent at 17 (footnote omitted). The prosecution had a continuing legal obligation to produce Daughter 1 for trial, and serving a subpoena on Huerta was part of that obligation. See State v. Ortiz, 74 Haw. 343, 363, 845 P.2d 547, 557 (1993), overruled on other grounds, State v. Moore, 82 Hawai'i 202, 221, 921 P.2d 122, 141 (1996). Fulfilling this obligation by subpoenaing Huerta, even though Daughter 1 had run away, does not suggest that the prosecution's effort was "bereft of any good faith basis."

The dissent also notes that the subpoena was served eleven days before trial. Dissent at 28, 30. However, courts have held that the prosecution's efforts were reasonable when attempting to serve the witness at a similar time before trial. Pillette v. Berghuis, 630 F. Supp.2d 791, 804 (E.D. Mich. 2009) (holding that the prosecution's efforts to locate an unavailable witness were reasonable when the prosecution, among other efforts, attempted serve the witness "approximately two weeks" before trial); State v. Black, 621 N.E.2d 484, 487 (Ohio App. 1993) (rejecting defendant's argument that the state should have attempted to locate the witness more than a week in advance of trial and "declin[ing] to adopt a bright-line rule establishing a time limit for efforts to be made to produce a witness.").

continue...

Daughter 1's unavailability.

2.    The prosecution has satisfied the unavailability test adopted in State v. Lee.

In State v. Lee, this court adopted the following

standard for the prosecution to prove unavailability:

> establishment of the prosecution's reasonable efforts to secure the presence of the declarant "require[s] a search equally as vigorous as that which the government would undertake to find a critical witness if it has no prior testimony to rely upon in the event of 'unavailability,'" .
> . . .

Lee, 83 Hawai'i at 278, 925 P.2d at 1102 (relying on Lynch, 499

F.2d at 1023).

This court has also stated that the mere "service of a

subpoena on the complaining witness did not establish her

unavailability . . . ." State v. Beyer, 72 Haw. 469, 473, 822

P.2d 519, 521 (1991), overruled on other grounds, Moore, 82

Hawai'i at 220, 921 P.2d at 140; Lee, 83 Hawai'i at 277 n.11, 925

P.2d at 1101 n.11 (quoting Beyer, 72 Haw. at 473, 822 P.2d at

521).

The prosecution satisfied the standard adopted in Lee

for three reasons.  First, nothing suggests the prosecution

intended to rely on the preliminary hearing testimony or that it

_____

[10]...continue
        Finally, the prosecution also took efforts to locate Daughter 1 that the prosecution did not take in Roberts by assigning an investigator to locate Daughter 1 and moving to sever the trial when it became apparent that it would be difficult to locate Daughter 1.  When compared to Roberts, the prosecution's efforts in this case were reasonable, and Vinhaca's rights under the Sixth Amendment of the United States Constitution were therefore not violated.

would have taken additional measures if it did not have Daughter 1's preliminary hearing testimony. As discussed above, the prosecution assigned an investigator to locate Daughter 1. Thus, a person within the prosecutor's office attempted to locate Daughter 1.

Additionally, when the prosecution discovered Daughter 1 would not likely appear at trial, it moved to sever the trial to avoid relying on Daughter 1's preliminary hearing testimony. This court has implied that moving for a continuance evidences the prosecution's good faith effort to locate a witness. See Moore, 82 Hawai'i at 224, 921 P.2d at 144 (noting that the prosecution's motion for a continuance, which was opposed by the defendant, was denied); see also United States v. Lynch, 499 F.2d 1011, 1024 (D.C. Cir. 1974) ("It is difficult to believe that if the preliminary hearing testimony of this critical witness were not available, the prosecution would have abandoned its efforts at this point to locate Miss Brown and concluded its case. We believe the prosecution would have asked the court for additional time within which to find her.") (emphasis added).[11] The

_____

[11] The dissent correctly notes that the prosecution did not seek a continuance of the entire trial, but did not object to one. See Dissent at 40-44. Although the prosecution did not request to continue the entire trial, it moved to sever the trial because it was prepared to proceed on those counts relating to Daughter 2. The prosecution requested to sever the trial because it would be "severely prejudiced" by having to proceed on charges relating to Daughter 1 when she was unavailable for trial. It is apparent from the record that both the prosecution and the defense understood that if the motion to continue...

19

prosecution in this case notified the circuit court that it would have trouble locating Daughter 1, and that it would prefer moving forward with the charges related to Daughter 2. Vinhaca opposed the prosecution's motion to sever and the circuit court denied the motion. The prosecution's motion to sever illustrates that its effort to locate Daughter 1 was in good faith because it requested additional time to locate Daughter 1.

Furthermore, the prosecution subpoenaed Huerta and Huerta attempted to locate Daughter 1. Thus, the prosecution made good faith efforts to locate Daughter 1 and nothing suggests that the prosecution would have taken additional efforts to locate Daughter 1 if it did not have her preliminary hearing testimony.

---

[11]...continue
sever was granted, the trial with regard to Daughter 1 would not proceed as scheduled. Thus, the motion to sever was the functional equivalent of a motion to continue the trial relating to Daughter 1 because it requested additional time to search for Daughter 1.

In response to the prosecution's motion to sever, Vinhaca asserted that "the State should seek a continuance of the entire trial and all of the pending charges or should dismiss the charges that the State is not able to prosecute and proceed with the charges that the State is able to." In reply, the prosecution asserted that "[j]ustice would be best served by allowing the State to proceed on [] (and have Defendant face in a timely manner) Counts 1 through 8." The dissent asserts that "the record reflects that Respondent could have asked for a continuance on its own, but did not." Dissent at 42. Respectfully, the prosecution's neutrality with regard to continuing the entire trial does not undercut the inference of good faith that its request to sever, and thus continue with regard to Daughter 1, raised.

Furthermore, contrary to the dissent's suggestion, the discussion above illustrates that the prosecution did not "obviously intend[] to rely on the preliminary hearing transcript of Daughter 1, despite its motion to sever." Dissent at 40. The prosecution's motion to sever demonstrates that it attempted to avoid using Daughter 1's preliminary hearing testimony by severing the trial and proceeding on those charges related to Daughter 2.

Second, the prosecution's subpoena to Huerta prompted Huerta to take additional efforts to locate Daughter 1. Other courts have included the efforts of social services workers in determining whether the prosecution made a good faith effort to locate a witness. For instance, in State v. Black, 621 N.E.2d 484, 487-88 (Ohio App. 1993), the court held that the prosecution made a good faith effort to locate a run-away thirteen year old witness ("Brock") by contacting the DHS and having members of DHS look for the witness. The prosecution "presented four witnesses to testify with respect to their efforts to locate Brock." Id. at 487. The four witnesses were "a supervisor in the Children's Division of the Hamilton County Department of Human Services, a supervisor in the special-placement unit of the Montgomery County Children's Services, a case worker at Montgomery County Children's Services, and Brock's mother." Id. The court stated that the testimony of these witnesses established:

> [T]hat Brock had been discharged from the United Methodist Children's Home in 1990 and had been returned to the custody of the Montgomery County Children's Board. The Montgomery County Children's Board returned custody of Brock to her mother in January 1992, after she had been missing for a period of six months. Brock's mother testified that she had not seen her daughter since 1991 and that she had no idea where Brock was currently staying. Brock's dental records had been given to the police and a warrant had been issued for her arrest, but the police had been unable to locate her.

Id. at 776, 621 N.E.2d at 487 (emphasis added).

The court concluded that the testimony of the four

21

witnesses, none of whom were members of the prosecution, established the unavailability of the run-away child.  The court held that Brock was unavailable because the "record reveals that Brock had a history of running away from her mother's home and from juvenile facilities; and that Brock had not been seen by her mother or juvenile authorities for a period of several months." Id. at 487-88.  Thus, even though the "prosecution" must make efforts to locate the witnesses, the efforts of DHS to look for a run-away teenage witness are not considered separately from the "prosecution's efforts."

Similarly, in State v. Sanchez, 592 A.2d 413, 415 (Conn. App. 1991), a thirteen year old witness, "E," was "turned over to the juvenile authorities" for possessing cocaine and heroin and left for Puerto Rico two days later.  In the subsequent trial of Sanchez, the state sought to introduce E's deposition testimony.  The state could not locate E before trial. Id.  The court held that the state established E's unavailability because the "state contacted an investigator for the juvenile court from the public defender's office and also a juvenile division probation officer in an attempt to locate E."  Id.  The investigator was unsuccessful in locating E, and the probation office had no information about E's whereabouts.  Id. at 415-16. Also, "the investigation stemming from information presented by

22

the defendant to the state as to E's whereabouts proved fruitless." Id. at 416. Furthermore, the state deposed E before she was released because of her probable unavailability and the defendant did not object to that procedure. Id. In Sanchez, the efforts of two witnesses, in offices distinct from the prosecutor's office, sufficed to establish E's unavailability. See also United States v. Thornton, 16 M.J. 1011, 1013 (A.C.M.R. 1983) (holding that the prosecution made a good faith effort to produce a German citizen where the prosecution tried to produce the witness' presence "by subpoena, and also sought assistance from her mother, her friends, and the German police."); United States v. Rundle, 298 F. Supp. 392, 395 (E.D. Pa. 1969) (holding that prosecution established good faith effort where in addition to the efforts of an investigator from the District Attorney's office, an Administrative Assistant from the Fort Mifflin Youth Development Center and the witness' mother testified that they were unable to locate the witness). Thus, because Huerta took extensive efforts to locate Daughter 1, the prosecution satisfied its obligation to show Daughter 1 was unavailable.

Third, although the prosecution could have taken additional efforts to locate Daughter 1, like "driver's license or motor vehicle registration searches[,]" see Lee, 83 Hawai'i at 279, 925 P.2d at 1103, these efforts would have been futile given

23

Daughter 1 was a minor, her history as a run-away, and the efforts already taken by the prosecution to locate her. Courts have recognized the increased difficulty of locating run-away minors, and have weighed this in determining whether the prosecution's efforts to locate a witness were reasonable. See Black, 621 N.E.2d at 488 (noting that the witness had a history of running away and stating that in "light of [the witness'] history and the efforts made by the prosecution to find her, we hold that the trial judge had sufficient evidence to find that [the witness] was unavailable") (emphasis added); Commonwealth v. Jackson, 344 A.2d 842, 844 (Pa. 1975) (holding that the state satisfied the good faith requirement because it "presented evidence that the child [witness] mysteriously disappeared shortly before trial and that he had previously run away 'many times.'"). For instance, in Roberts, the Court held that the prosecution was not required to take additional efforts to locate Anita because "the great improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution." Roberts, 448 U.S. at 75-76. Similarly, it is highly unlikely that additional efforts would have proved fruitful given that Daughter 1 had run away many times since October 31, 2006, and the prosecution subpoenaed

Huerta and assigned an investigator to locate Daughter 1 and neither person could find Daughter 1. The Confrontation Clause does not require the prosecution to take all possible efforts to locate a witness, but only requires the prosecution to take reasonable good faith efforts to locate a witness. Reed v. Hathaway, 596 F. Supp.2d 1200, 1206 (C.D. Ill. 2009) ("The rule is not that the government must do everything it can to get a witness to testify, rather only that it make a reasonable, good faith effort to get the witness into court.") (citing United States v. Reed, 227 F.3d 763, 767 (7th Cir. 2000)). The prosecution fulfilled its obligation to make a good faith effort to locate Daughter 1, and additional efforts would have proved futile.

## IV.    CONCLUSION

Based upon the foregoing analysis, we affirm the ICA's May 22, 2009, judgment.

DATED: Honolulu, Hawai'i, August 4, 2010.

William H. Jameson, Jr.,
   (Linda C.R. Jameson on
   the briefs) for petitioner-
   defendant-appellant

Tracy Murakami, Deputy
   Prosecuting Attorney,
   for respondent-plaintiff-
   appellee

25