292 P.3d 205

STATE of Hawai'i, Respondent/Plaintiff–Appellee,

v.

James MUNDON, Petitioner/Defendant–Appellant.

No. SCWC–10–0000101.

Supreme Court of Hawai'i.

Dec. 5, 2012.

Stuart N. Fujioka, for petitioner.

Charles A. Foster, for respondent.

NAKAYAMA, Acting C.J., ACOBA, McKENNA, and POLLACK JJ., and Circuit Judge NISHIMURA, in place of RECKTENWALD, C.J., Recused.

Opinion of the Court by ACOBA, J.

We hold, that the Circuit Court of the Fifth Circuit (the court)[1] erred by permitting Respondent/ Plaintiff–Appellee State of Hawai'i (Respondent) to introduce evidence of acts allegedly committed by Petitioner/Defendant–Appellant James Mundon (Petition-

er) for which a jury had acquitted him in a prior trial. The introduction of such evidence violates the principle of collateral estoppel embodied in the double jeopardy clause of article I, section 10 of the Hawai'i Constitution. Because of the likelihood of retrial, we also hold that the court (1) did not err in denying Petitioner's discovery request because any error was harmless, (2) did not improperly limit Petitioner's cross-examination by sustaining Respondent's objection to Petitioner's question regarding whether he "released" the complaining witness (hereafter Complainant) for purposes of the kidnapping offense, (3) erred in allowing Respondent and witnesses to use the term "victim" in their testimony, but that any such error was harmless and (4) erred by using information not provided to Petitioner as a basis for determining Petitioner's sentences.

For the reasons stated herein, we (1) affirm Petitioner's convictions for two counts of Assault in the Third Degree, (2) vacate his convictions for Attempted Sexual Assault in the First Degree and Kidnapping, and (3) vacate the court's sentence on Petitioner's convictions for the two counts of Assault in the Third Degree. In that light, we affirm in part and vacate in part the Judgment, Guilty Conviction, and Sentence entered by the court on October 13, 2010; affirm in part[2] and vacate in part the June 27, 2012 judgment of the ICA filed pursuant to its April 27, 2012 SDO; and remand to the court for further proceedings consistent with this opinion.

I.

A.

On August 15, 2005, Respondent filed a twenty-eight-count indictment against Petitioner, all stemming from alleged incidents occurring on the evening of February 4,

---

1. The Honorable Kathleen Watanabe presided.

2. Before the Intermediate Court of Appeals (ICA), Petitioner challenged the court's order that Petitioner pay restitution for Complainant's backpack because "restitution was not included in his original sentence." *State v. Mundon*, No. CAAP–10–0000101, 127 Hawai'i 3, 2012 WL 1473433, at *5 (App. Apr. 27, 2012) (hereinafter

*"Mundon II "*).The ICA determined that" restitution for Complainant's backpack ... violate[d] Hawai'i Revised Statutes (HRS) § 706–609 (Supp.2004), which prohibits an increased sentence after an appeal[.]" *Id.* Neither party challenged the ICA's ruling in this regard and therefore we affirm this part of the ICA's Summary Disposition Order.

2004, and the early morning of February 5, 2004. In his first trial, Petitioner represented himself, with stand-by counsel. On the charges, Petitioner was acquitted of all four counts (counts 1, 2, 3, and 22) of Sexual Assault in the Third Degree[3] (Petitioner's hand on Complainant's genitals), all five counts (counts 5–9) of Sexual Assault in the Third Degree (Petitioner's hand on Complainant's breast), all twelve counts (counts 10–21) of Sexual Assault in the Third Degree (Petitioner's mouth on Complainant's breast), one of two counts of Terroristic Threatening in the First Degree (TT1)[4] (count 26), and one count (count 23) of Attempted Sexual Assault in the Third Degree[5] (Complainant's hand on Petitioner's penis).

Petitioner was found guilty on one count of TT1 (count 4), one count of Kidnapping[6] (count 24), one count of Assault in the Third Degree[7] (count 25), one count (count 27) of Attempted Assault in the First Degree,[8] and one count (count 28) of Attempted Sexual Assault in the First Degree (attempted digital penetration)[9].

### B.

On certiorari from the first trial, this court concluded that (1) because, in support of the Attempted Sexual Assault in the First Degree charge (count 28), Respondent offered evidence that Petitioner "stuck his hand in the [C]omplainant's underwear and touched her outer labia three times[,]" and "[t]he evidence and the reasonable inferences therefrom established that [Petitioner] made three separate attempts to subject the [C]omplainant to an act of sexual penetration[,]" it was plain error for the court not to issue a specific unanimity instruction advising the jury that all twelve of its members must agree on which of the three acts supported count 28, *State v. Mundon*, 121 Hawai'i 339, 350, 352–53, 219 P.3d 1126, 1137, 1139–40 (2009) (hereinafter, "*Mundon I* ");(2) because the prosecution argued to the jury in support of the two TT1 counts (counts 4 and 26) that there were two separate instances in

3. HRS § 707–732(1)(f) (Supp.2004) states that "[a] person commits the offense of sexual assault in the third degree if ... [t]he person knowingly, by strong compulsion, has sexual contact with another person or causes another person to have sexual contact with the actor."

4. At the time of the offense, HRS § 707–716(1)(d) (1993) provided that "[a] person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening ... [w]ith use of a dangerous instrument[.]"

5. HRS § 705–500 (1993) provides as follows:
 § 705–500 Criminal Attempt
 (1) A person is guilty of an attempt to commit a crime if the person:
 (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or
 (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
 (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a

course of conduct intended or known to cause such a result.
 (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

6. HRS § 707–720(1)(d) (1993) provides that "[a] person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to ... [i]nflict bodily injury upon that person or subject that person to a sexual offense[.]"

7. HRS § 707–712 (1993) provides as follows:
 § 707–712 Assault in the third degree.
 (1) A person commits the offense of assault in the third degree if the person:
 (a) Intentionally, knowingly, or recklessly causes bodily injury to another person; or
 (b) Negligently causes bodily injury to another person with a dangerous instrument.
 (2) Assault in the third degree is a misdemeanor unless committed in a fight or scuffle entered into by mutual consent, in which case it is a petty misdemeanor.

8. HRS § 707–710 (1993) states that "[a] person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person."

9. HRS § 707–730(1)(a) (Supp.2004) states: "A person commits the offense of sexual assault in the first degree if ... [t]he person knowingly subjects another person to an act of sexual penetration by strong compulsion[.]"

**6**

which Petitioner threatened Complainant with a knife, and no specific unanimity instruction was given to the jury, it was impossible to know whether all twelve jurors agreed that the same underlying act supported the TT1 conviction, *id.* at 353–55, 219 P.3d at 1140–42; (3) the trial court's denial of Petitioner's motions seeking written transcripts of the preliminary hearing and grand jury proceedings was not harmless beyond a reasonable doubt, *id.* at 355–58, 219 P.3d at 1142–45; and (4) Petitioner was denied his constitutional due process right to adequately prepare his defense when the trial court proceeded with motions in limine although Petitioner did not have his trial materials and could not properly respond to the prosecution's motions in limine, *id.* at 358–59, 219 P.3d at 1145–46. This court reversed Petitioner's conviction for the one TT1 count (count 4),[10] and vacated Petitioner's remaining convictions (counts 24, 25, 27, and 28) and remanded the case for a new trial. *Id.* at 372, 219 P.3d at 1159.

## II.

On remand at Petitioner's second trial, the charges were renumbered as follows: count 1—Attempted Sexual Assault in the First Degree, HRS §§ 705–500 and 707–730(1)(a) (renumbered from Count 28); count 2—Kidnapping, HRS § 707–720(1)(d) (renumbered from count 24); count 3—Attempted Assault in the Second Degree, HRS §§ 705–500, 707–711 (renumbered from count 27) (attempted bodily injury to Complainant),[11] and count 4—Assault in the Third Degree, HRS § 707–712(1)(a) (renumbered from count 25). In his second trial, Petitioner again represented himself, with different stand-by counsel.

### A.

Prior to trial, on March 18, 2010, Petitioner filed a request for discovery of, *inter alia,* "[a]ny written documents supplied to [Complainant by Respondent] via e-mail, facsimile transmission, and U.S. mail secretly used to study, memorize, rehearse, and prepare her material trial testimony between February 2004–February 2007[.]" On March 30, 2010, Petitioner made a second discovery request for the same materials. On April 13, 2010, the court filed an order denying Petitioner's request on the ground that correspondence between Respondent and Complainant constituted Respondent's "attorney work product."

### B.

Just prior to opening statement, Respondent, referencing *Odum v. State,* 412 Md. 593, 989 A.2d 232, 244–45 (2010), indicated that it would introduce evidence of all of the acts for which Petitioner had been acquitted in his first trial. Petitioner objected to the admission of such evidence. The court overruled the objection.

At trial, Respondent called, among others, the following witnesses: Complainant, Christopher Ronon (Ronon), Kauai Police Department (KPD) Officers Clyde Caires (Officer Caires), James Rabasa (Officer Rabasa), Rolland Peahu (Officer Peahu) and Jesse Castro (Officer Castro), Lieutenant Sherwin Perez (Lieutenant Perez), and Nancy Wall (Wall).

#### 1.

Complainant testified that she arrived on Kauai from Canada on February 3, 2004. On her second day on the island, she met a man named "Tito" (Felix Guzman) during a bus ride. When she mentioned to Tito that she

---

**10.** This court stated that because Petitioner was charged with two counts of TT1, the prosecution introduced evidence of two distinct acts supporting those counts, no specific unanimity instruction was given, and the jury convicted on one count and acquitted on the other, there was no way to know which specific act served as the basis for the jury's conviction on count 4. *Mundon I,* 121 Hawai'i at 355, 219 P.3d at 1142. According to *Mundon I,* remanding for retrial on count 4 raised the distinct possibility that Petitioner could be retried for an offense involving

the conduct of which he was acquitted. *Id.* Because retrying Petitioner on count 4 would violate Petitioner's double jeopardy rights, this court determined that the conviction on that count had to be reversed. *Id.*

**11.** In Petitioner's first trial he was charged with Attempted Assault in the First Degree (serious bodily injury). On retrial, Petitioner was tried instead of Attempted Assault in the Second Degree (substantial bodily injury).

planned to stay on the beach, he advised her that it was not safe to do so. Complainant and Tito left the bus at a stop near Kapaa. Tito asked Complainant to wait at a bench while he went to see if there was room for Complainant at a nearby hostel.

While waiting, Complainant saw Petitioner pacing near the water with a flashlight. Complainant asked him what he was doing and for the time. Petitioner told her he was fishing, and that it was 10 p.m. Tito returned and related that the hostel was full. Petitioner mentioned that "he had connections [from] his fire inspection job" and that he could get a hotel room for Complainant at a "hugely discounted rate[.]" Petitioner appeared to make some telephone calls. Complainant saw Tito and Petitioner conversing but was unable to hear what they were saying. Complainant advised Petitioner that she was tired and was "just going to snooze where [she] was sitting[.]" Petitioner offered to allow Complainant to sleep in the cab of his truck. Complainant awoke to find the truck moving; Complainant had "no idea" where she was and Tito was not in the truck. When she inquired regarding Tito's whereabouts, Petitioner informed her that he had given Tito forty dollars and instructed him to go ahead and secure a hotel room.

Complainant and Petitioner eventually ended up at an "open area." Petitioner told Complainant that the hotel "was in the distance" and that Petitioner was supposed to flash his lights and Tito would come to the truck. Petitioner flashed his lights but Tito did not come. Petitioner exited the truck and told Complainant he was going to look for Tito. After a while, Petitioner returned with "no news of seeing him."

Complainant told Petitioner that she "needed to go pee." Petitioner "ripped off a piece of towel" for Complainant "to wipe with after." Complainant went to use the restroom and returned to the truck, sat in the passenger seat, and tried to fall asleep. Just before she fell asleep, Petitioner told her that they needed to leave. He related that he was going to the other "access part of the hotel" because there may have been some

confusion regarding where to meet. Petitioner explained he was frustrated because they had been "waiting too long" and "Tito owed him money."

Complainant told Petitioner she wanted to return to the area where she had slept the previous night and then fell back asleep. When she awoke, they were headed down a bumpy road. The truck stopped and Complainant observed lights to the right side of the vehicle and "bushy" trees to the left; she also heard the ocean in front of her. Petitioner stated that they were at "the other access point to the hotel," then left with a flashlight and told Complainant that he was going to look for Tito or a security guard.

Petitioner returned "without any news of either of them." Petitioner instructed Complainant to roll up her window and lock the doors because there were "wild cats" in the area. He then went to look for Tito or a security guard one more time. This time when Petitioner returned, he informed Complainant that he had instructed a security guard who had seen Tito on the hotel property to direct Tito to the truck.

Complainant started to "drift off again." She awoke shortly after and Petitioner's hand "had already gone up the bottom of [her] dress" and he was "touching [her] outer labia." [12] Complainant believed she had given Petitioner the "wrong impression" so she "apologized and wiggled away and said like I'm sorry, I don't actually like you, I'm really sorry." Petitioner was "super apologetic and [he] backed off right away and said just like I'm sorry and [ ] it won't happen again." She thought everything "was all cleared up" so she went back to sleep, but when she awoke, Petitioner again had his hand "up [her] dress and under the waistband of [her] panties and [was] trying to go further down and touching [sic] the outer labia area."

She thought Petitioner was confused so she reiterated what she had said earlier, only "more loudly" and "repeated it a couple more times." Petitioner seemed "shocked" and "backed away" and "apologized profusely[.]" Complainant fell asleep, assuming everything

---

**12.** Webster's dictionary defines "outer labia" or "labia majora" as "the outer fatty folds of the vulva bounding the vestibule." *Merriam Webster's Collegiate Dictionary* 649 (10th ed.1993).

was clear to Petitioner, but when she woke up, once again, Petitioner's arm was up her dress and he was "touching [her] outer labia[.]" Complainant "did not want to spend one moment around any longer" so she grabbed her bag and turned to leave by the passenger door. Petitioner grabbed her from behind and squeezed her tight. She asked him what he was doing and instructed him to let go of her. Petitioner threatened that "he had a knife" and would "cut [her] if [she] wasn't still and to shut up." Complainant felt "something cold and [ ] sharp-edged" pressed against her neck but did not actually see a knife.

Complainant asked Petitioner what he wanted her to do and he told her to take off her clothes. When she said "no," he told her he would "cut" her so she took off most of her clothes but did not take off her dress. When she refused to take off her dress, Petitioner warned her that she did not want to see him "fully angry" because Petitioner did not know what he would do. As a result, Complainant complied.

Petitioner then began to touch and kiss Complainant's breasts. She stated that his hands were "kind of like all over" and one of his hands again went under the waistband of her underwear and over her outer labia area. She was "wiggling the entire time and trying to get away[.]" She told him that she "was menstruating" but he responded he did not care and continued to "grope" her. Petitioner directed Complainant to "touch his penis" and when she refused, he became "angry" and threatened to tie her up. He reached into his glove compartment and pulled out some rope and tape.

In an attempt to get Petitioner "to be repulsed[,]" Complainant stated she needed to "pee and poo." Petitioner told her to "go in the truck[,]" but she begged to exit the truck, and he agreed. She got out and "went both pee and poo." Petitioner handed her a towel after. She then hurried back to the vehicle, grabbed her backpack and "ran as fast as she could with [her] bag on [her] back[.]" Complainant did not get very far before Petitioner caught up with her and grabbed her by the underwear. Petitioner tackled her from behind and "shoved [her]

... to the ground." Her chin, knees, and elbows hit the ground.

When Complainant began screaming, Petitioner shoved sand and his fingers down her throat. She tried to get the knife away from Petitioner but her attempts were "futile" because he was "really strong." She wanted to bite his fingers but Petitioner's hand "was too far down [her] throat[.]" At some point during the struggle, Petitioner punched Complainant in the rib area. Petitioner then started "breathing really heavily"; "like overly labored." Complainant saw Petitioner suddenly "go pale," and look "really weird and sick[.]" She told him she would not run away and that she would take off her sandals as proof. Petitioner apparently believed her and backed up a bit. Complainant removed her sandals and started running.

Complainant ran toward the hotel but came to a canal. She crossed through the canal, and ran to the oceanfront units. She went up to one of the units and began banging on the patio window and yelling. A man came to the screen door and she said, "He's after me and he's going to hurt me, let me in, I need to get in." She was given a sheet to wrap around her and some clothing.

The police were called and she informed them that "someone had tried to rape [her]" and provided Petitioner's first name, and a description of Petitioner and his vehicle. Complainant told Officer Caires that she had left her clothing in Petitioner's truck and that there were fire extinguishers and milk cartons in the back of the truck.

2.

Ronon testified that on February 5, 2004, he was vacationing on Kauai with his wife and two other couples. They were staying in a condominium unit at Kauai Beach Villas. At approximately 3:30 a.m., he and his wife heard pounding on the sliding door and someone yelling, "[H]elp me, help me; let me in; he's after me; he's got a knife." Ronon opened the sliding door and a young woman in underwear, whom Ronon identified as Complainant, ran past him and crouched down on the side of the bed and said, "[H]e's after me; he tried to rape me; he attacked

me." The woman also stated, several times, that "he has a knife." According to Ronon, the woman was shaking "uncontrollably," and looked "to be in a state of panic." Ronan called the police and they arrived ten minutes later.

### 3.

Officer Caires testified that at approximately 3:20 a.m. on February 5, 2004, he was dispatched to one of the rooms at the Kauai Beach Villas. He observed a woman wrapped in a white sheet shaking uncontrollably. She told him she was twenty-one years old. Having determined that a "major crime" had occurred, he called detectives to take over the investigation.

### 4.

At approximately 4:00 a.m. on February 5, 2004, Officer Peahu and Officer Castro were dispatched to Petitioner's residence. They discovered Petitioner's Ford pickup truck parked on the front lawn. In the truck bed were fire extinguishers and milk cartons. Petitioner was sleeping in the truck and when the officers approached, he woke up and got out of his vehicle. Officer Peahu noticed Petitioner had "sweat on his face," his shirt was damp, and his shirt and shorts were dirty. Officer Castro observed "cuts and scrapes" on both of Petitioner's knees, and sand on his feet and "around the open wound" on Petitioner's knee. Petitioner was placed under arrest. Officer Castro saw a dress and folding knife on the driver's seat, and white rope and a roll of tape on the floorboard.

Complainant's backpack and sandals were found in a sandy area near Marine Camp Road, the area where Complainant alleged she was assaulted. Lieutenant Perez testified that a white towel with fecal matter was found near a bush in the area.

### 5.

The court qualified Wall, a retired registered nurse, as an expert in the field of nursing, and as a Sexual Assault Nurse Examiner (SANE). Wall examined Complainant on February 5, 2004, and observed multiple bruises, lacerations, and abrasions on Complainant's body. Sand fell from Complainant's head and pubic hair when she combed through it. Wall indicated that Complainant appeared to be menstruating at the time of the examination.

Complainant had bruising and marks on her neck, consistent with Complainant's statement that she felt pressure on her neck from a cold, hard, possibly sharp object. Complainant also had a "recent abrasion" on her knee with particles of sand on the abrasion. Wall answered affirmatively when asked whether such an injury was consistent with Complainant's story that she fell in the sand while attempting to escape. According to Wall, the minor lacerations on Complainant's elbows were also consistent with Complainant being tackled from behind.

### 6.

Petitioner did not testify at trial.

### C.

Petitioner was found guilty of Attempted Sexual Assault in the First Degree (count 1, renumbered from Count 28); Kidnapping–No voluntary release[13] (count 2, renumbered from count 24), the lesser included offense of Assault in the Third Degree (count 3, renumbered from count 27, Attempted Assault in the Second Degree), and Assault in the Third Degree (count 4, renumbered from count 25). He was sentenced to twenty years of imprisonment in counts 1 and 2 and one year of imprisonment in counts 3 and 4. The twenty-year terms in counts 1 and 2 were ordered to run consecutively, the one-year terms in counts 3 and 4 were ordered to run concurrently with each other and concurrently with the terms in counts 1 and 2. The court ordered a mandatory minimum period of imprisonment of six years and eight months in

---

13. Kidnapping is "a class A felony" except "[i]n a prosecution for kidnapping, it is a defense which reduces the offense to a class B felony that the defendant *voluntarily released the victim,* alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial." HRS § 707–720(2) and (3) (emphasis added).

**10**

count 1 and 2, without the possibility of parole.

### D.

Petitioner appealed once again. On appeal to the ICA, Petitioner argued that the court erred by:

(1) improperly limiting discovery; (2) improperly permitting evidence of acts for which [Petitioner] was acquitted in the first trial, without also admitting evidence that [Petitioner] was acquitted of those alleged acts; (3) improperly limiting cross examination of the [Complainant]; (4) improperly allowing [Respondent] to make references to [the] Complainant as "victim" over the objection of the defense; and (5) imposing consecutive twenty year sentences, an award of restitution, and a mandatory minimum term of imprisonment.

*Mundon II*, 2012 WL 1473433, at *1.

As to the first point, the ICA rejected Petitioner's argument that the court erred in denying Petitioner's discovery request because, (1) although Hawai'i Rules of Penal Procedure (HRPP) Rule 16(b)(1)(i)[14] requires the prosecution to disclose to the defendant "'any relevant written or recorded statements,'" assuming some of the material requested constituted "statements," they would be "statements recorded by the prosecution" and hence not subject to disclosure,

*id.* at *2; (2) the material sought by Petitioner would not tend to negate Petitioner's guilt, *id.*; and (3) the material requested constituted attorney-work product under HRPP Rule 16(e)(5)(i). *Id.*

As to the second point, the ICA determined that because "the acts underlying the acquitted charges were intrinsic to a charge for which [Petitioner] was retried, [ ] it was not error to admit evidence of those acts." *Id.* (citing *Odum*, 989 A.2d at 244–45). In the ICA's view, the court did not abuse its discretion in concluding that the evidence of acts supporting the acquitted charges were relevant and not unfairly prejudicial. *Id.* According to the ICA, the court "properly sought to preclude *all* references to the first trial because such evidence, under a [ ] Hawai'i Rules of Evidence (HRE) Rule 403 balancing, could result in unfair prejudice, confusion of the issues or misleading the jury." *Id.* (emphasis in original). The ICA further concluded that the court did not err in admitting evidence of acts supporting the acquitted charges without permitting Petitioner to introduce evidence of the acquittals. *Id.*

As to the third point, the ICA concluded that Petitioner was not denied his right to meaningful cross-examination when the court sustained Respondent's objection to Petitioner's question, "What was [Petitioner] doing

---

**14.** HRPP Rule 16(b) provides as follows:

b) Disclosure by the Prosecution.

(1) Disclosure of Matters Within Prosecution's Possession. The prosecutor shall disclose to the defendant or the defendant's attorney the following material and information within the prosecutor's possession or control:

(i) the names and last known addresses of persons whom the prosecutor intends to call as witnesses in the presentation of the evidence in chief, together with any relevant written or recorded statements, provided that statements recorded by the prosecutor shall not be subject to disclosure;

*(ii) any written or recorded statements and the substance of any oral statements made by the defendant, or made by a co-defendant if intended to be used in a joint trial, together with the names and last known addresses of persons who witnessed the making of such statements;*

(iii) any reports or statements of experts, which were made in connection with the particular case or which the prosecutor intends to introduce, or which are material to the prepa-

ration of the defense and are specifically designated in writing by defense counsel, including results of physical or mental examinations and of scientific tests, experiments, or comparisons;

(iv) any books, papers, documents, photographs, or tangible objects which the prosecutor intends to introduce, or which were obtained from or which belong to the defendant, or which are material to the preparation of the defense and are specifically designated in writing by defense counsel;

(v) a copy of any Hawai'i criminal record of the defendant and, if so ordered by the court, a copy of any criminal record of the defendant outside the State of Hawai'i;

(vi) whether there has been any electronic surveillance (including wiretapping) of conversations to which the defendant was a party or occurring on the defendant's premises; and

(vii) *any material or information which tends to negate the guilt of the defendant as to the offense charged or would tend to reduce the defendant's punishment therefor.*

when he agreed to let you go?" *Id.* at *4. The ICA reasoned that there was no evidence that Petitioner voluntarily agreed to let Complainant go. *Id.* Moreover, Petitioner was not precluded from rephrasing the question and was able to and did in fact cross-examine Complainant extensively on the issue of voluntary release. *Id.*

As to the fourth point, the ICA did not decide whether Respondent's references to Complainant as the "victim" was error. The ICA held instead that, assuming it was error, the error was harmless beyond a reasonable doubt because (1) there were only a few "victim" references by the deputy prosecutor, and (2) the court's instructions regarding the presumption of innocence cured any error. *Id.* at *5 (citing *State v. Nomura,* 79 Hawai'i 413, 416–18, 903 P.2d 718, 721–23 (App. 1995)).

As to the fifth point, the ICA held it was not error for the court to justify the imposition of consecutive twenty-year sentences, in part, on the ground that Petitioner was " 'in the same category as [the defendant in another sexual assault case] in terms of the need for consecutive sentencing.' "[15] *Id.* In addition, the ICA pointed out that the court evaluated the factors set forth under HRS § 706–606 (1993).[16]

### III.

In his Application for Writ of Certiorari, Petitioner raises the same questions raised before the ICA:

---

15. As noted, Petitioner also challenged the court's order that Petitioner pay restitution for Complainant's backpack because "restitution was not included in his original sentence." *Mundon II,* 2012 WL 1473433, at *5. None of the parties challenge the ICA's ruling in this regard and hence this issue is not addressed further.

16. HRS § 706–606 provides as follows:
§ 706–606 Factors to be considered in imposing a sentence. The court, in determining the particular sentence to be imposed, shall consider:
(1) The nature and circumstances of the offense and the history and characteristics of the defendant;
(2) The need for the sentence imposed:
(a) To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;

---

1. Did the ICA err in affirming the [court's] limit on discovery?

2. Did the ICA err in affirming the admission of evidence at retrial, of crimes for which [Petitioner] had been acquitted in the first trial?

3. Did the ICA err in affirming limits of cross-examination of [Respondent's] witness?

4. Did the ICA err in affirming [Respondent's] references to [ ] [C]omplainant as "victim?"

5. Did the ICA err in affirming the [court's] imposition of [a] consecutive sentence upon improper grounds? [[17]]

Respondent did not file a Response to the Application.

### IV.

◼ Petitioner's first question relates to his request for documents supplied to Complainant between February 2004 and February 2007, which the court denied on the ground that the material requested constituted attorney work product. Complainant replaced her earlier description of being "groped" in her underwear with a reference to her "outer labia" being touched.

Prior to Petitioner's second trial, Complainant did not use the term "outer labia." The statutory definition of "sexual penetration," for purposes of Sexual Assault in the Third Degree is defined in part as "any intrusion of any part of a person's body or of

---

(b) To afford adequate deterrence to criminal conduct;
(c) To protect the public from further crimes of the defendant; and
(d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) The kinds of sentences available; and
(4) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

17. Petitioner raised the same arguments on appeal to the ICA. *See Mundon II,* 2012 WL 1473433, at *1.

any object into the genital or anal opening."
HRS § 707–700 (Supp.2004). In 2006, HRS § 707–700 was amended to define "genital opening" as including "the anterior surface of the vulva or *labia majora* [.]" *See* 2006 Haw. Sess. Laws Act 230, § 26 at 1013–14 (emphasis added). Complainant's use of the term "outer labia" would arguably serve as some basis for Petitioner's request.

As Respondent noted in its Answering Brief, the prosecution is not required to disclose all information, correspondence, evidence, and other material in its possession. HRPP Rule 16(b)(1)(vii) requires the prosecutor to disclose "any material or information which tends to negate the guilt of the defendant as to the offense charged or would tend to reduce the defendant's punishment therefor."

The materials requested by Petitioner constituted "correspondence" between Respondent and Complainant, and "records" (statement made by Complainant to the police) under the rule. HRPP Rule 16(e)(5)(i) protects correspondence and reports only "to the extent that they contain the opinions, theories or conclusions" of the attorney or the attorney's member or legal staff. Respondent has not alleged that the materials requested by Petitioner contained any of its "opinions, theories or conclusions" relating to the case. Here, the court did not ascertain whether the material requested actually constituted protected work product of Respondent.

Petitioner suggested before the ICA that it may be error for the court to make a determination regarding discovery of material claimed to be privileged without at least conducting an *in camera* review of the documents at issue. *See O'Connell v. Cowan*, 332 S.W.3d 34 44 (Ky.2010) (concluding that it was improper for the court to order discovery of work product without a prior *in cam-*

*era* inspection). However, any error was harmless in this case.

As disclosed in oral argument before this court, Petitioner's concern was only with the use of the term "outer labia." However, Petitioner did have the opportunity to cross-examine Complainant regarding her use of that term. Petitioner's cross-examination of Complainant regarding this issue, under the circumstances here, rendered any error harmless. Accordingly, the ICA did not gravely err in affirming the denial of Petitioner's discovery request.

## V.

In connection with Petitioner's second question, Petitioner maintains that the court's error violated his rights against double jeopardy under the Fifth Amendment to the United States Constitution and article 1, section 10 of the Hawai'i Constitution,[18] and his rights to due process and equal protection under the Fifth and Fourteenth Amendments to the United States Constitution, and article 1, sections 5 [19] and 14 of the Hawai'i Constitution. We decide this question under Article 1, Section 10.

As stated, Respondent indicated prior to trial that it intended to introduce evidence of "[a]ll of the acts that occurred in the incident," including the acts of which Petitioner was acquitted. Respondent had apparently presented the court with a memorandum of law, referencing *Odum,* which was attached thereto. This memorandum does not appear to have been filed.

Petitioner, acting pro se, initially noted that in *Odum,* there were five accomplices whereas in the instant case, Petitioner was the only person involved. Because it had been proven that he "didn't do" those acts, Petitioner argued it would not "be fair" to introduce those acts in his second trial. For

---

18. Article 1, section 10 of the Hawai'i Constitution states, in relevant part, that "nor shall any person be subject for the same offense to be twice put in jeopardy." Haw. Const. Art. 1, § 10.

19. Article I, section 5 of the Hawai'i Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the

laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry." Article I, section 14 of the Hawai'i Constitution provides in part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation[.]"

example, he noted he was acquitted of "touching [Complainant's] genital area" and that "it would be unfair for [Respondent] to use that—again, to convict [him] for the attempted crimes or continuing conduct of the attempted sexual assault and kidnapping charge."

Next, Petitioner maintained that use of the acts of which he was acquitted would violate his "constitutional rights [against] double jeopardy." Petitioner specifically stated that in order to convict him of attempted sexual assault in the first degree, Respondent would need to prove that "touching the genital[s]" was "a substantial step." He urged, however, that it would be a violation of double jeopardy for Respondent to introduce evidence in his second trial that he touched Complainant's genitals because he was acquitted of such acts in his first trial.

Finally, Petitioner argued that introducing these acts would "raise questions to these new jurors" regarding his first trial. Thus, he maintained that allowing Respondent to "reintroduce evidence that [he] was acquitted for [sic] would . . . prejudice [him]."

In response, Respondent related that although the *Odum* court ruled that Rule 404(b) of the Maryland Rules of Evidence did not apply because these were not other or "prior bad acts," the evidence was relevant to establishing Petitioner's state of mind for the retried offenses. Respondent stated, for example, that such acts would "show that [Petitioner] had the intent [to] unlawfully restrain[] [Complainant] in order to subject her to a sexual offense." In addition, Respondent argued that although the evidence was prejudicial, the risk of prejudice did not outweigh its probative value.

The court ruled that Respondent would not be "precluded from admitting evidence of *all* of the offenses that [Petitioner] faced during his first trial, as they were all part of the same criminal episode of the charges he faces on retrial." (Emphasis added.) The court

added that "any alleged prejudice . . . [did] not outweigh the probative value of the evidence[.]"[20] Subsequently, acquitted acts were introduced in connection with the Attempted Sexual Assault in the First Degree and the Kidnapping charges.

## VI.

Respondent argued to the ICA that the evidence was properly admitted because (1) the acts "were all part of the same criminal episode" and hence admissible, (2) under HRE Rule 403, the evidence was "highly probative" and although prejudicial, not "*unfairly*" prejudicial, (quoting *Odum,* 989 A.2d at 245) (emphasis in original), and (3) Petitioner was not subjected to double jeopardy because (a) the acquittals meant only that the jury had reasonable doubt as to whether he completed the sexual contact,[21] (b) he was retried only for Attempted Sexual Assault in the First Degree, and (c) although acquitted of touching Complainant's genitals, evidence of such acts could be offered to support the "substantial step" for purposes of the Attempted Sexual Assault in the First Degree count.

Respondent did not challenge Petitioner's alternative argument that the court should have at least instructed the jury that Petitioner had been acquitted of "completed sexual contact[.]" Instead, Respondent argued that the court's error was harmless beyond a reasonable doubt because "[t]he jury was properly instructed as to the offense of Attempted Sexual Assault in the First Degree, including a specific unanimity instruction, and the jury only needed to find a 'substantial step' in furtherance of sexual penetration by strong compulsion; it did not need to find completed sexual contact."

## VII.

### A.

 It is established that the guarantee against " '[d]ouble jeopardy protects individu-

---

**20.** Although the court referenced prejudice and probative value, the court did not specifically cite HRE Rule 403.

**21.** Respondent asserted that Petitioner's acquittal in his first trial of all Sexual Assault in the Third Degree charges meant only that the jury

could not find beyond a reasonable doubt that Petitioner completed the alleged sexual contact but it does not mean he did not commit a substantial step toward sexual penetration by reaching "under the waistband of [Complainant's] panties, to her vaginal area."

als against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.'" *State v. Ake*, 88 Hawai'i 389, 392, 967 P.2d 221, 224 (1998) (quoting *State v. Quitog*, 85 Hawai'i 128, 141, 938 P.2d 559, 572 (1997)). Double jeopardy does not, however, "prohibit a state from retrying a defendant whose judgment of conviction is set aside because of [the trial court's] error." *State v. Cabral*, 8 Haw.App. 506, 511, 810 P.2d 672, 676 (1991). In this case Petitioner was not retried on the counts of which he was convicted, but only on the counts vacated in *Mundon I* on account of trial error. Therefore, double jeopardy does not bar retrial on the counts for which Petitioner was convicted.

### B.

However, the United States Supreme Court has held that "collateral estoppel" is a principle embodied in the right against double jeopardy, and precludes relitigation of issues already decided, even when double jeopardy is not necessarily implicated. *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). In *Ashe*, the defendant was charged with armed robbery arising from an incident during which four masked men, armed with shotguns, broke into the basement of a home while six men were engaged in a poker game, and robbed them. *Id.* at 437, 90 S.Ct. 1189. The defendant was one of four men arrested in connection with the incident. *Id.* He was tried for the armed robbery of one of the poker players, and was found not guilty. *Id.* at 439, 90 S.Ct. 1189.

Six weeks later, the defendant was brought to trial for the robbery of another participant in the poker game. *Id.* Although the witnesses were for the most part the same, the testimony was substantially stronger in the second trial. *Id.* at 439–440, 90 S.Ct. 1189. For example, two witnesses who had been unable to identify the defendant as one of the robbers, testified in the second trial as to the defendant's features, size, and mannerisms. *Id.* at 440, 90 S.Ct. 1189. Another witness who identified the defendant only by size and actions in the first trial, identified the defendant by the unusual sound of his voice. *Id.* The prosecution also declined to call a participant in the poker game whose identification testimony in the defendant's first trial had been "conspicuously negative." *Id.* The defendant was found guilty in the second trial. *Id.*

Relying on the doctrine of collateral estoppel, the Court reversed the defendant's conviction. The Court explained that collateral estoppel means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." [22] *Id.* at 443, 90 S.Ct. 1189. The Court held that the doctrine prevented the prosecution from relitigating in the second trial the ultimate fact issue of whether the defendant had participated in the robbery that had previously been determined by a valid and final judgment in the first trial. *Id.* at 446, 90 S.Ct. 1189.

The Court remarked that at common law and under the early federal statutes, "a single course of criminal conduct was likely to yield but a single offense." *Id.* at 446 n. 9, 90 S.Ct. 1189. However, more recently, with the "extraordinary proliferation of overlapping and related statutory offenses, it became possible for prosecutors to spin out a startlingly numerous series of offenses from a single alleged criminal transaction." *Id.* As the number of offenses increased, "the potential for unfair and abusive reprosecutions became

---

**22.** Where, as in this case, a defendant is retried, collateral estoppel does not squarely apply "since retrial cannot be 'collateral' if it is a 'continuation' of the first trial." *U.S. v. Bailin*, 977 F.2d 270, 276 (7th Cir.1992). Instead, "[i]ssue preclusion 'within the confines of a single claim or cause of action' is known as 'direct estoppel.'" *Id.* (citing 18 Charles A. Wright et al., Federal Practice & Procedure § 4418, at 169 (1981) (Federal Practice & Procedure)). Both collateral estoppel and direct estoppel "bar the government from relitigating issues that were necessarily and finally decided in the defendant's favor by reason of the jury's partial acquittal on other counts." *Id.* at 276–77; see also *Yeager v. United States*, 557 U.S. 110, 120, 129 S.Ct. 2360, 174 L.Ed.2d 78 (2009) (holding that the Ashe doctrine includes direct estoppel). However, because the cases generally refer to collateral estoppel, that term is employed herein.

far more pronounced." *Id.* Thus, the courts soon recognized the need to prevent abuses through the doctrine of collateral estoppel. *Id.*

■ However, in applying the doctrine of collateral estoppel to a general jury verdict of acquittal, courts must be careful not to take a "hypertechnical and archaic approach," but should, "with realism and rationality ... examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude *whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration* [.]" *Id.* at 444, 90 S.Ct. 1189 (emphasis added). The inquiry " 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' " *Id.* (Quoting *Sealfon v. United States,* 332 U.S. 575, 579, 68 S.Ct. 237, 92 L.Ed. 180 (1948)). Otherwise, "[a]ny test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal." *Id.*

Applying collateral estoppel to the case at hand, the Court reasoned that once a jury had "determined by its verdict that the [defendant] was not one of the robbers, the State could [not] *constitutionally* hale him before a new jury to litigate that issue again." *Id.* at 445, 90 S.Ct. 1189 (emphasis added). In other words, because a jury had already determined *"there was at least a reasonable doubt* that the [the defendant] was one of the robbers, the State could not present the same or different identification evidence in a second prosecution ... in the hope that a different jury might find that evidence more convincing." *Id.* at 446, 90 S.Ct. 1189 (emphasis added).

## C.

### 1.

In *Dowling v. United States,* 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990), however, a majority of the Court appeared to employ a more technical and restrictive defini-

tion of collateral estoppel. In that case, the defendant was charged with bank and armed robbery. *Id.* at 344, 110 S.Ct. 668. The bank robber had been wearing a ski mask during the robbery. *Id.* The defendant's first trial ended in a hung jury. *Id.* In his second trial, the defendant was convicted on both counts but his convictions were reversed on appeal. *Id.* In his third trial, the prosecution sought to call Vena Henry to testify regarding a crime of which the defendant had been acquitted. *Id.* at 344–345, 110 S.Ct. 668. Henry would testify that two men, one wearing a mask and carrying a small handgun, entered her home approximately two weeks after the bank robbery, and that she was able to unmask the masked man, whom she would identify as the defendant. *Id.* The prosecution argued that the testimony was admissible because Federal Rules of Evidence (FRE) Rule 404(b) allowed the admission of crimes, wrongs, or acts for purposes other than character evidence, i.e., to establish that the mask described by Henry was similar to the mask worn in the bank robbery, and to establish that the defendant could be linked to the other man alleged to have entered Henry's home. *Id.* at 345, 110 S.Ct. 668.

Under FRE Rule 404(b) the Government only had to establish that the other acts had occurred by a preponderance of the evidence. *Id.* at 356, 110 S.Ct. 668. The district court admitted the evidence, reasoning that it was highly probative circumstantial evidence. *Id.* at 345, 110 S.Ct. 668. Henry was permitted to testify but following her testimony, the district court instructed the jury that the defendant had been acquitted of robbing Henry, and emphasized the limited purpose for which Henry's testimony was being offered. *Id.* at 345–46, 110 S.Ct. 668. The court reiterated that admonition in its final charge to the jury. *Id.* at 346, 110 S.Ct. 668.

The majority assumed that "Dowling's acquittal established that there was a reasonable doubt as to whether Dowling was the masked man who entered Vena Henry's home[.]" *Id.* But, according to the majority, "to introduce evidence on this point at the bank robbery trial, the Government did not have to demonstrate that Dowling was the

man who entered the home beyond a reasonable doubt: the Government sought to introduce Henry's testimony under Rule 404(b)," and "'[i]n the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.'" *Id.* (quoting *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)). Thus, "[b]ecause a jury might reasonably conclude that Dowling was the masked man who entered Henry's home, even if it did not believe beyond a reasonable doubt that Dowling committed the crimes charged at the first trial, the collateral estoppel component of the Double Jeopardy Clause [was] inapposite." *Id.* at 348–49, 110 S.Ct. 668. Consequently, the majority held that "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof."[23] *Id.* at 349, 110 S.Ct. 668.

The majority based its holding on prior cases that it said supported this proposition. (Citing *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984), and *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972)). In both of those cases the Court had allowed the evidence to be admitted in the in rem proceedings "partly because of the clearly lower standard of proof in the subsequent civil proceeding and partly because the later proceeding was remedial rather than punitive in nature." *United States v. Crispino*, 586 F.Supp. 1525, 1533 (1984). Following the civil cases, the jury verdict in the first action did not "negate the possibility that a preponderance of the evidence could show that [the defendant] was engaged in" an act of which the defendant was later acquitted. *Id.*

Alternatively, the majority held that even if the lower standard of proof under FRE Rule 404(b) applied in a second proceeding did not avoid the collateral estoppel issue, the evidence would still be admissible. *Id.* at

350, 110 S.Ct. 668. *Dowling* noted that *Ashe* stated "that where a previous judgment of acquittal was based on a general verdict, courts must ... 'conclude whether a rational jury could have grounded its verdict on an issue other than that which the defendant seeks to foreclose from consideration.'" *Id.* (quoting *Ashe*, 397 U.S. at 444, 90 S.Ct. 1189). In that regard, the defendant "did not demonstrate that his acquittal in his first trial represented a jury determination that he was not one of the men who entered Henry's home." *Id.*

2.

Justice Brennan, joined by Justice Marshall and Justice Stevens, dissented. Justice Brennan wrote that "[t]o permit a second trial after an acquittal, however mistaken the acquittal may have been, would present an unacceptably high risk that the Government, with its vastly superior resources, might wear down the defendant, so that even though innocent he may be found guilty." *Id.* at 355, 110 S.Ct. 668 (internal quotation marks and citation omitted).

In addition to protecting against retrial for the same offense, the doctrine of collateral estoppel protects the defendant from having to relitigate any ultimate facts resolved in the defendant's favor by the prior acquittal. *Id.* at 356, 110 S.Ct. 668. Thus, the collateral estoppel doctrine "would preclude the Government from introducing evidence which relies on facts previously determined in the defendant's favor by an acquittal." *Id.*

In Justice Brennan's view, the majority's analysis was "inconsistent with [the Court's] admonition in *Ashe* that an excessively technical approach to collateral estoppel 'would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal cases, at least in every case where the first judgment was based upon a general verdict of acquittal.'" *Id.* at 358, 110 S.Ct. 668 (emphasis in original) (quoting *Ashe*, 397 U.S. at 444, 90 S.Ct. 1189). Justice Brennan elaborated

---

**23.** The Court was referring to the fact that under FRE 404(b) evidence of the prior acquitted crime (Henry's testimony) would be admissible "if the jury can reasonably conclude that the act occurred and that the defendant was the actor,"

and "the Government did not have to demonstrate that Dowling was the man who entered the home beyond a reasonable doubt." *Dowling*, 493 U.S. at 348, 110 S.Ct. 668.

that "[w]henever a defendant is forced to relitigate the facts underlying a prior offense for which he has been acquitted, there is a risk that the jury erroneously will decide that he is guilty of that offense[.]" *Id.* at 361, 110 S.Ct. 668. The danger is that "the jury may feel that the defendant should be punished for [extrinsic] activity even if he is not guilty of the offense charged." *Id.* at 362, 110 S.Ct. 668. There is also a risk that "the evidence may lead the jury to conclude that, having committed a crime of the type charged, the defendant is likely to repeat it." *Id.* (internal quotation marks and citation omitted).

Justice Brennan also attacked the majority's use of civil cases to justify its holding "those forfeiture cases involved civil remedial measures rather than criminal punishment." *Id.* at 359, 110 S.Ct. 668 (citations omitted). Never before had "such reasoning [been applied] to a successive criminal prosecution in which the Government [sought] to punish the defendant and hinge[d] that punishment at least in part on a criminal act for which the defendant ha[d] been acquitted." *Id.* at 360, 110 S.Ct. 668. Indeed, in *Ashe* the Court had indicated to the contrary: "It is much too late to suggest that [collateral estoppel] is not fully applicable to a former judgment in a criminal case," because "the judgment may reflect only a belief that the Government had not met the higher burden of proof [(beyond a reasonable doubt)] exacted in such cases for the Government's evidence as a whole...." 397 U.S. at 443, 90 S.Ct. 1189 (citation omitted). According to Justice Brennan, "*[b]y definition, when the Government fails to prove a defendant guilty beyond a reasonable doubt, the defendant is considered legally innocent.*" *Id.* (emphasis

added). Justice Brennan believed that at least with respect to subsequent criminal prosecutions, "the acquitted defendant is to be treated as innocent and in the interests of fairness and finality made no more to answer for his alleged crime." *Id.* (citing *State v. Wakefield*, 278 N.W.2d 307, 308 (Minn.1979)).

### VIII.

#### A.

▉ *Ashe* appears to reflect the better reasoned approach and the rationale therein is hereby adopted under the Hawai'i Constitution.[24] Recognizing that the proliferation of statutory offenses allows the prosecution to charge a defendant with multiple counts based on the same incident, the Court adopted the collateral estoppel doctrine to curb potential abuses. *See Ashe*, 397 U.S. at 443–444, 90 S.Ct. 1189. The Court intended to prevent putting a defendant in the position of having to relitigate his guilt as to an issue already decided in his favor by an acquittal. *See id.* at 445–446, 90 S.Ct. 1189 ("For whatever else that constitutional guarantee may embrace ... it surely protects a man who has been acquitted from having to 'run the gauntlet' a second time.").

Yet, under *Dowling*, the prosecution is permitted to introduce evidence that the defendant committed an act for which the defendant was already acquitted, so long as the burden to establish the occurrence of the act is less than beyond a reasonable doubt such as admission of evidence under FRE 404(b). This undermines the legal presumption that a defendant is innocent until proven guilty. *See Dowling*, 493 U.S. at 361, n. 4, 110 S.Ct.

---

**24.** This court, "[a]s the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution, [is] free to give broader protection than that given by the federal constitution." *State v. Detroy*, 102 Hawai'i 13, 22, 72 P.3d 485, 494 (2003). We therefore independently adopt the collateral estoppel rule as set forth in *Ashe* as being embodied in the double jeopardy clause of the Hawai'i Constitution.

It must be noted that "state courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution." *Arizona v. Evans*, 514 U.S.

1, 8, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). "If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached." *Michigan v. Long*, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). In consonance with *Long*, federal cases are cited in this opinion only for the purpose of guidance as to the issues raised by Petitioner in this case. The Hawai'i Constitution, as opposed to federal law, compels the result reached herein.

668 (Brennan J., dissenting) (holding that "when the Government fails to prove a defendant guilty beyond a reasonable doubt, the defendant is considered legally innocent," and "with respect to subsequent criminal prosecutions, 'the acquitted defendant is to be treated as innocent and in the interests of fairness and finality made no more to answer for his alleged crime.'") (quoting *Wakefield*, 278 N.W.2d at 308. The prosecution in effect is allowed to argue that despite its failure to prove that the defendant was guilty of an act in the first trial, the defendant is not innocent and has, despite the prior acquittal, committed the act. *See id.* at 363, 110 S.Ct. 668.)

Additionally, admitting evidence of an acquitted crime compels a defendant (if he or she hopes to prevent the jury from deciding the issue against him) to *again* defend the same conduct for which he or she had already been acquitted. In this regard, the majority's position in *Dowling* is contrary to *Ashe*. Compare *Dowling*, 493 U.S. at 352, 110 S.Ct. 668 ("We recognize that the introduction of evidence in circumstances like those involved here has the potential to prejudice the jury or unfairly force the defendant to spend time and money relitigating matters considered at the first trial.") with *Ashe*, 397 U.S. at 445, 90 S.Ct. 1189 ("Once a jury had determined upon conflicting testimony that there was at least a reasonable doubt that the petitioner was one of the robbers, the State could not present the same or different identification evidence in a second prosecution for the robbery of [the complainant] in the hope that a different jury might find that evidence more convincing."). Moreover, the

passage of time and the additional expense of having to defend against acts that were not charged may make it more difficult for the defendant to mount a second defense. *Dowling*, 493 U.S. at 363, 110 S.Ct. 668 (Brennan J., dissenting).

Further, there is a risk that the jury will convict the defendant because it believes that the fact that the defendant committed the prior act (despite the acquittal) makes it more likely that the defendant committed the charged offense. There is also a risk that the jury will feel that the defendant was guilty of the prior acquitted charge even if it believes the defendant is not guilty of the charged offense, and will convict the defendant in order to punish him for the prior offense. These dangers, which strike at the heart of the protections embodied in the Double Jeopardy Clause are not addressed by the majority in *Dowling*. *Ashe* and the dissenters' view[25] in *Dowling* are thus more faithful than the majority's position in *Dowling* to the principles of the presumption of innocence, the burden of proof beyond a reasonable doubt, and the efficacy of an acquittal.

Also, the majority in *Dowling* does precisely what *Ashe* admonishes should not be done, inasmuch as the majority employs a hypertechnical approach to the doctrine of collateral estoppel. In *Ashe*, the Court had explained that "[i]f a later court is permitted to state that the jury may have disbelieved substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest, the possible multiplicity of prosecutions is staggering."[26] 397 U.S. at 444 n.

---

25. In the past, this court has not hesitated to adopt the dissents in U.S. Supreme Court cases when it was believed the dissent was better reasoned than the majority opinion. See, e.g., *State v. Cuntapay*, 104 Hawai'i 109, 85 P.3d 634 (2004) (agreeing with the dissent in *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998)); *see also State v. Kam*, 69 Haw. 483, 748 P.2d 372 (1988)(adopting the reasoning of the dissent in *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987)); *State v. Santiago*, 53 Haw. 254, 492 P.2d 657 (1971) (adopting the dissent in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)).

26. The principles of *Ashe* may have been codified by our legislature in HRS § 701-111(2) (Supp. 2004), which provides as follows:

§ 701-111 **When Prosecution is barred by former prosecution for a different offense**
Although a prosecution is for a violation of a different statutory provision or is based on different facts, it is barred by a former prosecution under any of the following circumstances:
(2) The former prosecution was terminated by an acquittal or by a final order or judgment for the defendant which has not been set aside, reversed, or vacated and which acquittal, final order, or judgment necessari-

9, 90 S.Ct. 1189. Moreoever, *"such a restrictive definition of 'determined' amounts simply to a rejection of collateral estoppel,* since it is impossible to imagine a statutory offense in which the government has to prove only one element or issue to sustain a conviction."[27],[28] *Id.* (emphasis added).

### B.

*Banther v. State,* 884 A.2d 487 (Del.2005), decided post-*Dowling,* is also instructive. In *Banther,* Banther was acquitted in his first trial of conspiring to commit murder, but convicted of first-degree murder. *Id.* at 489. On appeal, however, the Delaware Supreme Court vacated the murder conviction and remanded for retrial. *Id.* On retrial, the prosecution attempted to prove the first-degree murder charge by establishing accomplice liability, specifically arguing that Banther agreed to aid the principal, his accomplice, in "planning" the murder. *Id.* The supreme court of Delaware reversed Banther's conviction for first-degree murder and remanded for a new trial, concluding that in allowing the prosecution to make this argument, the trial court "failed to account for the collateral estoppel effect of the earlier acquittal for conspiracy." *Id.*

That court noted that the Delaware Constitution protects defendants against double jeopardy and that "[p]rinciples of double jeopardy ... are subsumed by the broader doctrine of collateral estoppel, which 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot be litigated between the same parties in any future law suit.'" *Id.* at 492 (quoting *Marine v. State,* 624 A.2d 1181, 1190 (Del.1993) (citing *Ashe,* 397 U.S. at 443, 90 S.Ct. 1189)).[29] Conspira-

cy required, in part, an intent to agree to aid another in the planning of a felony. *Id.* at 493. But accomplice liability may be established by acting "unilaterally, without a preexisting agreement, by spontaneously deciding to aid, counsel, or attempting to aid another, or by agreeing to aid a principal in planning or committing a crime." *Id.*

In arguing that Banther acted as an accomplice by aiding the principal in planning the murder, the State implied Banther acted jointly as opposed to unilaterally. *Id.* The Delaware Supreme Court concluded that "[t]he State's references to Banther's planning focused on concerted actions, which although not labeled as a 'conspiracy,' nonetheless operated as the functional equivalent of the agreement element that is fundamental to a conspiracy." *Id.* But, because Banther had already been acquitted of conspiracy to commit murder, that court concluded, "The earlier jury must have rejected the fact of an agreement between Banther and [the principal.]" *Id.* at 494. Consequently, *Banther* held under collateral estoppel principles, that accomplice liability could be established only "on the basis of Banther's individual, independent and spontaneous actions-not on the basis of a theory that he and [the principal] had 'worked together' on the plan." *Id.*

Similarly, in the instant case, Respondent prosecuted both the Attempted Sexual Assault in the First Degree and Kidnapping charges by seeking to establish that Petitioner had committed acts of sexual assault for which he had already been acquitted. Collateral estoppel bars the prosecution from seeking to have the jury decide for the second time whether Petitioner had in fact commit-

---

ly required a determination inconsistent with a fact which must be established for conviction of the second offense.
Our statute is modeled after the Model Penal Code. HRS § 701–111 was not raised or argued by either party. Assuming its application, HRS § 701–111 reiterates, but does not replace, the constitutional rule.

**27.** The term "determined" refers to the court's use of that word in preceding text, that "Collateral Estoppel" means simply that " 'when an issue of ultimate fact has once been *determined* by a valid and final judgment, that issue cannot again

be litigated between the same parties in any future lawsuit.'" *Dowling,* 493 U.S. at 347, 110 S.Ct. 668 (quoting *Ashe,* 397 U.S. at 443, 90 S.Ct. 1189) (emphasis added).

**28.** As the double jeopardy clause applies only to criminal prosecutions, the collateral estoppel rule adopted herein does not affect the standard for collateral estoppel in civil cases.

**29.** *Banther* noted that the doctrine of collateral estoppel is codified in a Delaware statute. That statute is worded identically to HRS § 701–111(2).

ted the acts of which he had already been acquitted in his first trial.[30]

## IX.

In this case, in order to convict Petitioner of Attempted Sexual Assault in the First Degree (digital penetration), Respondent was required to prove beyond a reasonable doubt that Petitioner had taken a "substantial step" toward digitally penetrating Complainant, and that he exerted "strong compulsion." Respondent sought to establish that Petitioner had taken a substantial step toward digitally penetrating Complainant in the second trial by proving beyond a reasonable doubt that Petitioner had touched Complainant's labia. Respondent also apparently argued that the fact that Petitioner "fondled" Complainant's breasts demonstrated strong compulsion.[31]

■ It must first be determined whether Petitioner's acquittal in his first trial on counts 1, 2, 3, and 22, Sexual Assault in the Third Degree (hand on genitals), on counts 5, 6, 7, 8 (hand on breast), and on counts 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21 (mouth on breast) amount to a decision by the jury that Petitioner did not in fact touch Complainant's labia and breasts or put his mouth on her breasts. *See Ashe*, 397 U.S. at 443, 90 S.Ct. 1189 ("'Collateral estoppel' . . . means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."). As noted, this inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Id.* It must be borne in mind that "the ground[s] of acquittal cannot generally be ascertained." *United States v. Mespoulede*, 597 F.2d 329, 333 (1979). Thus, in ascertaining whether an acquittal reflects a jury's determination as to a particular issue, a court "must not make the defendant's task even more formidable by straining to postulate 'hypertechnical and unrealistic' grounds on which the jury could conceivably have rested its conclusions[.]" *Id.* (quoting *United States v. Jacobson*, 547 F.2d 21, 23 (2d Cir. 1976)).

### A.

### 1.

■ The indictment against Petitioner in his first trial on counts 1, 2, 3, and 22, Sexual Assault in the Third Degree, stated, identically, as follows:

On or about the 5th day of February, 2004, in the County of Kauai, State of Hawai'i, [Petitioner] did knowingly, by strong compulsion, have sexual contact

---

30. Respondent, the court and the ICA incorrectly relied on *Odum*. Odum was charged with, and tried for, his involvement with four others in the armed robbery, carjacking, kidnapping, and murder of two individuals. 989 A.2d at 234. He was acquitted on all offenses except for kidnapping. *Id.* At Odum's retrial, the State sought to present evidence relating to the acquitted crimes. *Id.* Odum attempted to preclude such evidence, arguing that the prosecution was barred by the doctrine of collateral estoppel. *Id.* at 235–36. Nevertheless, the trial court admitted the evidence as relevant "to the overall criminal venture and to the [d]efendant's role and participation" and as probative of events before the kidnapping that was not outweighed by any unfair prejudice. *Id.* at 236.
 The Maryland Supreme Court, relying on *Dowling, Id.* at 241, held that evidence of the acquitted counts could be admitted in the second trial for a purpose that would not require the State to prove those acts beyond a reasonable doubt. Similarly, here, for example, Respondent argued that the evidence was relevant to proving Petitioner's requisite intent for the attempted sexual assault and kidnapping offenses. But, in admitting evidence of such acts based upon a lower standard of proof than beyond a reasonable doubt, *Odum* followed *Dowling*. As discussed *supra*, the precepts in *Ashe*, as opposed to *Dowling*, should govern.

31. Specifically as to the "substantial step" element for count 1, Respondent identified Petitioner's touching of Complainant's labia as the "substantial step" Petitioner took toward penetration. In closing argument during the second trial, the prosecution argued:

 Did [Petitioner] take a substantial step in causing sexual penetration by strong compulsion? Strong compulsion [sic] is any intrusion of any part of a person's body into the genital opening. We heard how close the labia was. *And that after he had held the knife to her, he fondled her breast. But the sexual assault here is when he put his hand under her underwear and he was on top of her labia and he was going to digitally penetrate her.*
 (Emphasis added).

with [Complainant], by putting his *hand on her genitals,* thereby committing the offense of Sexual Assault in the Third Degree in violation of Section 707–732(1)(f) of the [HRS].

(Emphasis added.) The indictment on counts 5, 6, 7, 8, 9 and likewise stated identically:

On or about the 5th day of February, 2004, in the County of Kauai, State of Hawai'i, [Petitioner] did knowingly, by strong compulsion, have sexual contact with [Complainant], by putting his *hand on her breast,* thereby committing the offense of Sexual Assault in the Third Degree in violation of Section 707–732(1)(f) of the [HRS].

(Emphasis added.) The same pertained to counts 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 21:

On or about the 5th day of February, 2004, in the County of Kauai, State of Hawai'i, [Petitioner] did knowingly, by strong compulsion, have sexual contact with [Complainant], by putting his *mouth on her breast,* thereby committing the offense of Sexual Assault in the Third Degree in violation of Section 707–732(1)(f) of the [HRS].

In order to find Petitioner guilty of these offenses, then, Respondent was required to prove that Petitioner subjected Complainant to sexual contact (1) by placing his hand on her genitals and breasts, and by placing his mouth on her breasts, (2) by strong compulsion, and (3) by doing so knowingly as to the foregoing elements. *See State v. Veikoso,* 126 Hawai'i 267, 280, 270 P.3d 997, 1010 (2011). As recounted, Petitioner was found not guilty of the foregoing offenses.

In light of the number of times Complainant maintained Petitioner had touched her genitals and touched and put his mouth on her breasts, the acquittals could not have been predicated on the jury's finding that Petitioner had done these acts, but done so unknowingly. *See Mespoulede,* 597 F.2d at 333 (concluding that the jury's acquittal for possession of cocaine with intent to distribute could not have been predicated on a finding by the jury that the defendant possessed the cocaine but did not intend to distribute it in

light of the quantity the defendant was charged with possessing). The jury in the first trial also convicted Petitioner of "*intentionally* engag[ing] in conduct which, *under the circumstances as he believed them to be,* constituted a substantial step in a *course of conduct* intended to culminate in his commission of the crime of Sexual Assault in the First Degree[,]" pursuant to count 28 of the indictment. (Emphases added.) Petitioner "commits the offense of Sexual Assault in the First Degree ... if he *knowingly* subjects another person to an act of sexual penetration by strong compulsion." HRS § 707–730 (emphasis added). It would appear, then, that the jury believed Petitioner acted with knowledge and intent.

Nor does it appear that the jury determined that Petitioner did in fact touch Complainant's genitals and breasts and put his mouth on her breasts, but did not do so "by strong compulsion." To reiterate, "strong compulsion" means

the use of or attempt to use one or more of the following to overcome a person:

(1) A threat, express or implied, that places a person in fear of bodily injury to the individual or another person, or in fear that the person or another person will be kidnapped;

(2) A dangerous instrument; or

(3) Physical force.

HRS § 707–700. The jury convicted Petitioner of Kidnapping in his first trial, which required Respondent to prove that Petitioner "restrained" Complainant, HRS § 707–720(1)(d), which is defined as "restrict[ing] a person's movement in such a manner as to interfere substantially with the person's liberty ... [b]y means of force, threat, or deception[,]" HRS 707–700 (1993). Hence, it may be presumed that the jury did conclude Petitioner exercised strong compulsion over Petitioner at some point.

Additionally, as discussed, the jury in the first trial also convicted Petitioner of count 28, Attempted Sexual Assault in the First Degree, in violation of HRS §§ 705–500 and 707–730(1)(a). As related, Petitioner "commits the offense of Sexual Assault in the First Degree ... if he knowingly subjects

another person to an act of sexual penetration by *strong compulsion.*" HRS § 707–730 (emphasis added). Since the jury found that Petitioner acted with strong compulsion in attempting to sexually penetrate Complainant, it would seem highly unlikely that a rational jury could also find that Petitioner did not use strong compulsion in touching Complainant's genitals and breasts or in kissing Complainant's breasts.[32]

The jury verdict is logical and can be reconciled if the jury concluded that Petitioner attempted to sexually assault Complainant (acting with the requisite knowledge and employing strong compulsion as required to convict of that offense) but never completed the acts of touching her genitals and breasts or putting his mouth on her breasts, which were the acquitted acts upon which the offenses were predicated. Thus, based on the indictment and evidence presented in this case, it may be presumed that the jury decided in Petitioner's first trial that Petitioner did not actually touch Complainant's genitals, as charged in counts 1, 2, 3, and 22, touch her breasts, as charged in counts 5, 6, 7, 8, and 9, or put his mouth on her breasts, as charged in counts 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 21.

2.

During the second trial, Respondent nevertheless introduced evidence that Petitioner touched Complainant's genitals[33] and breasts, and that he put his mouth on her

breasts. Respondent argued to the jury that the act of touching Complainant's genitals was a substantial step necessary to complete the offense of Attempted Sexual Assault in the First Degree. Respondent also apparently contended that all three acts were relevant to establish Petitioner's state of mind with respect to that offense.

■ However, the jury decided these issues in the Petitioner's "favor by reason of the jury's partial acquittal on other counts [in the first trial]." *See United States v. Bailin,* 977 F.2d 270, 276 (7th Cir.1992) (holding that collateral estoppel applies when a defendant faces a new trial on counts subject to a mistrial and the defendant was acquitted of other counts in the original trial); *see also Yeager v. United States,* 557 U.S. 110, 120, 129 S.Ct. 2360, 174 L.Ed.2d 78 (2009) (holding that "the reasoning in *Ashe* is controlling" when a "case involves an acquittal on some counts and a mistrial on others"). Applying collateral estoppel, Petitioner's alleged touching of Complainant's genitals and breasts and the placing of his mouth on her breasts could therefore not be relitigated before the second jury. *See Ashe,* 397 U.S. at 447, 90 S.Ct. 1189. It is apparent that under *Ashe,* Respondent's attempt to use the acts of which Petitioner was acquitted to establish beyond a reasonable doubt that Petitioner committed a substantial step toward the commission of Sexual Assault in the First Degree was prohibited by the first jury's prior determination in favor of Petitioner to

---

**32.** Assuming *arguendo,* any ambiguity about the presence of strong compulsion in connection with Petitioner's alleged acts of the touching of Complainant's genitals, this would seemingly apply "realism and rationality," *Ashe,* 397 U.S. at 444, 90 S.Ct. 1189, in squaring the acquittal verdicts with the convictions for Attempted Sexual Assault in the First Degree and Kidnapping.

**33.** In its case-in-chief, Respondent adduced testimony from Complainant regarding four specific instances in which Petitioner touched what Complainant specifically referred to as her "outer labia." Complainant stated that she had fallen asleep and when she awoke Petitioner's hand "had already gone up the bottom of [her] dress" and he was "touching [her] outer labia." She indicated that she fell back asleep and awoke once again with Petitioner's hand "up [her] dress and under the waistband of [her] panties and trying to go further down and touching the outer

labia." She testified that she went back asleep, believing everything was clear to Petitioner, but Petitioner again touched her "outer labia[.]" Complainant said he told her to get undressed and again placed his hand "under the waistband of her underwear and over her outer labia area."

Respondent asked Complainant, "When you mention the outer labia, that is the part that's on the outside or your vaginal area?" Complainant answered affirmatively. Respondent then asked, "[so you] mention he started touching and kissing your breasts and then he groped and his hand was under your waistband, over the outer labia, close to your vaginal area?" Complainant again answered in the affirmative. When Respondent asked Complainant to explained what she meant by grope, Complainant explained, "Going under the waistband of my panties.... And touching the outer labia."

the effect that these acts did not occur. The court therefore erred in allowing Respondent to use evidence of these acts to establish a substantial step toward the commission of the subject offenses.

 Respondent also argues that the acts were relevant to show Petitioner's intent. Again, applying the rational jury standard established in *Ashe,* the jury in the first trial had already decided that Petitioner did not commit the acts of touching Complainant's genitals and breasts or of placing his mouth on her breasts. *Ashe* does not differentiate between the use of acts to establish an element of the offense beyond a reasonable doubt and their introduction under a lower standard of proof pursuant to the rules of evidence. *Id.* at 443, 90 S.Ct. 1189. As *Ashe* maintained, " '[i]t is much too late to suggest that this principle [of collateral estoppel] is not fully applicable to a former judgment in a criminal case, . . . because the judgment may reflect only a belief that the Government had not met the higher burden of proof [beyond a reasonable doubt] exacted in such cases[.]' " *Id.* (quoting *United States v. Kramer,* 289 F.2d 909, 913 (1961)). Therefore, the acts of which Petitioner was acquitted should have been excluded from trial. The conviction for Attempted Sexual Assault in the First Degree must be vacated and the case remanded with instructions that evidence of the acquitted acts must be excluded in any retrial.[34]

### B.

To prove that Petitioner committed Kidnapping, HRS § 707–720(1)(d), Respondent had to establish that Petitioner "intentionally or knowingly restrain[ed Complainant], with the intent to *inflict bodily injury upon her or subject her to a sexual offense* [.]" (Emphasis added.) It appears that in this case, Respondent attempted to show that Petitioner intended both to inflict bodily injury and to subject Complainant to a sexual offense. Respondent argued this to the jury in closing argument.

> Kidnapping. This is important. *Did he intentionally restrain [Petitioner] to inflict bodily injury or subject her to a sexual offense.* Restrain means to do so or interfere with her liberty by means of force, threat or deception. Again, clearly, he deceived her into locking the doors [of the vehicle], [he] roll[ed] up the windows, grabbed her torso, held a knife to her throat, ordered her to take off her clothes, touched—or attempted to touch her labia, licked her breast, asked her to touch his penis. She ran from his prison. He chased her, ripped her panties, tackled her to the ground. He had the knife. He's hitting her body. He's pushing her. She's trying to get up. He's shoving sand in her mouth to prevent her from yelling for help until she's finally able to run away from his grasp[.]

(Emphasis added).

 As is evident, Respondent relied on acts of which Petitioner was acquitted (placing his hand on Complainant's breasts or genitals, or his mouth on her genitals, or asking her to touch his penis [35]) in order to

---

**34.** In *State v. Lemalu,* 72 Haw. 130, 809 P.2d 442 (1991), under the driving under the influence of intoxicating liquor statute in existence at the time, HRS § 291–4(a) (1985), the State could prove a violation through two alternative sections of the statute, HRS § 291–4(a)(1) and HRS § 291–4(a)(2). *Lemalu* noted that prior cases had held that an acquittal on either section (a)(1) or section (a)(2) was an acquittal "in form only," and did not constitute an acquittal on the HRS § 291–4(a) charge as a whole. *Id.* at 139, 809 P.2d at 447. When an acquittal was "in form only," *Lemalu* held that double jeopardy concerns were not implicated, and, therefore, the State could retry a defendant *based on the section of the statute subject to the judgment of acquittal. Id. Lemalu* is inconsistent with our holding that once an acquittal is based on a finding that the defendant did not commit certain acts, collateral estoppel prevents the prosecution from introducing evidence of those acts in a subsequent trial.

**35.** The same reasons, discussed *supra,* that demonstrate that a rational jury must have found that Petitioner did not touch Complainant's breasts or genitals also demonstrate that the only basis on which a rational jury could have acquitted Petitioner on the charge of Attempted Sexual Assault in the Third Degree (Complainant's hand on Petitioner's penis) was that there was a failure to prove that Petitioner ordered Complainant to touch his penis. The only evidence presented to support this charge was Complainant's testimony that Petitioner told her to touch his penis. As discussed *supra,* the jury's other findings in the first trial preclude a determination that Complainant was not subject to "strong compulsion."

make the case that Petitioner had the intent to subject Complainant to a sexual assault. But as explained, *supra,* Respondent was barred from relying on those acts under the *Ashe* rationale because the issue of whether Petitioner had committed those acts had been finally resolved in Petitioner's favor by the acquittals in the first trial. As such, it was error for the court to allow Respondent to argue that those acts established that Petitioner intended to sexually assault Complainant.

As noted, Respondent also argued to the jury that Petitioner had the intent to inflict bodily injury. It is impossible to ascertain whether the jury relied on the intent to commit sexual assault (which was predicated on the acts of which Petitioner was acquitted) or the intent to inflict bodily injury. Therefore, Petitioner's conviction on the Kidnapping count must be vacated and the case remanded due to the erroneous admission of the sexual assault acts, as the jury may have relied on those acts to convict Petitioner of Kidnapping. Thus, on remand, evidence of the acquitted sex assault acts must be excluded in any retrial.[36]

### X.

■ The count charging Attempted Assault in the Second Degree, HRS §§ 705–500 and 707–710 (count 3, renumbered from count 27), alleged Petitioner "intentionally engaged in conduct, which, under the circumstances as he believed them to be, constituted a substantial step in a course of conduct intended or known to cause serious bodily injury to [Complainant][.]" The count charging Assault in the Third Degree, HRS § 707–712 (count 4, renumbered from count 25), alleged Petitioner "intentionally, knowingly, or recklessly cause[d] bodily injury to [Complainant.]" In its closing argument, Respondent stated that the attempted assault charge was based on Petitioner's conduct of "putting sand and fingers down [Complainant's] throat[.]" Respondent stated that the assault charge was based on the "act of hitting [Complainant's] back and [ ] ribs[.]" Respondent did not reference any of the acquitted counts.

■ Additionally, Petitioner did not argue on appeal to the ICA or in his Application that any of the acts of which he was acquitted were offered in support of the attempted assault and assault counts. Because none of the acquitted counts supported Petitioner's convictions for the included offense of Assault in the Third Degree (count 3, renumbered from count 27) and Assault in the Third Degree (count 4, renumbered from count 25), and Petitioner makes no other meritorious arguments regarding those counts, convictions as to these counts are affirmed.[37]

---

Moreover, under the circumstances of this case, the demand itself would constitute a substantial step in the offense of Attempted Sexual Assault in the Third Degree. Because the "substantial step" required to prove Attempted Sexual Assault in the Third Degree would have been Petitioner's demand, and the demand itself is evidence of Petitioner's intent, a rational jury could not have acquitted Petitioner unless it found that the prosecution failed to prove beyond a reasonable doubt that the demand was made.

**36.** Petitioner also argues that Respondent's use of the acts of which Petitioner was acquitted violated his right to due process. As noted by Justice Brennan, according double jeopardy significance to an acquittal "reflects both an institutional interest in preserving the finality of judgments and a strong public interest in protecting individuals against governmental overreaching." *Dowling,* 493 U.S. at 355, 110 S.Ct. 668 (Brennan, J., dissenting). In *State v. Perkins,* 349 So.2d 161, 162–63 (Fl.1977), the Florida Supreme Court held that under the Florida Constitution, it was "fundamentally unfair to a defendant to admit evidence of acquitted crimes."

That court has since reaffirmed its holding in *Perkins. See Burr v. State,* 576 So.2d 278 (Fl. 1991) (clarifying that *Perkins* was based on an independent state law ground after a remand from the United States Supreme Court for the Supreme Court of Florida to reconsider its decision in light of *Dowling* ); *see also State v. Shropshire,* 45 S.W.3d 64 (Tenn.Crim.App.2000) (holding that "an acquittal precludes the possibility of an inference that the defendant committed the crime"). Petitioner should not be compelled to relitigate issues that were already decided in his favor by a prior jury. To burden Petitioner with the necessity of mounting a second defense to charges of which he was acquitted would be fundamentally unfair and could result in a miscarriage of justice.

**37.** In his Application, Petitioner argues in the alternative that, if evidence of acquitted acts was admissible, the jury must be informed that he

## XI.

In light of the likelihood of retrial, we address Petitioner's third and fourth questions.

■ Petitioner's third question concerned his alleged voluntary release of Complainant in connection with the kidnapping charge. Defense counsel asked Complainant on cross-examination, "What was [Petitioner] doing when he agreed to let you go[?]" Respondent objected on the ground that the question misstated the evidence as assuming Petitioner "let [Complainant] go." The court sustained the objection and directed Petitioner to rephrase the question. Petitioner contends first that he was improperly limited by the court because there was testimony that could be construed as evidence that Petitioner "physically let [Complainant] go" and second that although the court permitted him to rephrase the question, he was "never able to fully explore the issue of voluntary release[.]"

As to Petitioner's first contention, he states that Complainant testified that at some point during the struggle between them, Complainant told Petitioner, "I'll stay and, and as proof, I'll remove my sandals." She testified that Petitioner "believe[d her] and let[ ] go and back[ed] up a tiny bit." Complainant related that Petitioner let go of her only after she had attempted to flee, that Petitioner caught up with her, that they began struggling, and that Complainant agreed she would not run away. In that light, the court cannot be said to have abused its discretion in sustaining Respondent's objection because the question implied as a matter of fact that Petitioner had voluntarily agreed to release Complainant. *See State v. Jackson,* 81 Hawai'i 39, 47, 912 P.2d 71, 79 (1996) ("The scope and extent of cross and recross-

examination of a witness is within the sound discretion of the trial judge.").

■ As to Petitioner's second contention, he claims the court limited his right to cross-examine Complainant. However, the court permitted Petitioner to "rephrase" his question regarding "let[ting] complainant go." But instead of asking more questions on the issue, Petitioner asked only, "Was I chasing [you] after you left?" Complainant responded, "After I had taken off my sandals, I did not look behind me to make sure if you were chasing me or not." Petitioner then asked whether Complainant had "walked up to the hotel area[.]" But when Complainant answered, "No, I ran as fast as I could[,]" Petitioner terminated cross-examination regarding the issue of voluntary release. Consequently, Petitioner's right to confrontation was not violated. *See State v. Jackson,* 81 Hawai'i at 47–48, 912 P.2d at 79–80 (concluding that the defendant's right to confrontation was not violated "given that defense counsel voluntarily terminated the recross-examination because the intended line of questioning became redundant").

## XII.

### A.

As to Petitioner's fourth question, during Wall's testimony, Wall referred to Complainant as the "victim." When Petitioner objected, on the ground that Wall was "making a conclusion[,]" the court sustained Petitioner's objection. During Officer Caires' testimony, the officer indicated that he returned the items he recovered "to the victim." Respondent asked, "And the victim was able to identify both of the items as belonging to her?" Petitioner again objected, urging that it had already been agreed that Respondent

had been acquitted of those acts. To dispel the notion that this would be an adequate remedy, it is noted that when acquitted acts are admitted for evidentiary purposes, there is a greater possibility the jury may conclude the defendant committed those acts. *Dowling,* 493 U.S. at 362, 110 S.Ct. 668 (Brennan J., dissenting). Even if the jury is informed of the acquittals, "[t]here is no guarantee that the jury will give any weight to the acquittal[s]; the jury may disregard [them] or even conclude that the first jury made a mistake." *Id.* n. 5. Because a jury may convict a

defendant based in part on those acts of which he had already been acquitted, the defendant would be compelled to present affirmative evidence to defend against the very acts for which he had been previously found not guilty. *Id.* at 362, 110 S.Ct. 668. It is apparent, then, that an instruction informing the jury that the defendant has been acquitted of acts introduced in a second trial is insufficient to protect the defendant from having to relitigate issues that were already decided in his favor.

would not use the term "victim." Petitioner noted before the ICA that Respondent referred to Complainant as "the victim" during the questioning of two other officers as well. The court overruled Petitioner's objections to these references.

Petitioner maintains that Respondent's references to Complainant as the "victim" were " 'incompatible with the presumption of innocence' " and violated his right to due process. (Quoting *Jackson v. State*, 600 A.2d 21, 25 (Del.1991).) He urges that the ICA's reliance on *Nomura*, was misplaced because unlike in *Nomura*, here, the court's instruction regarding the presumption of innocence, did not "defuse[ ] the bias resulting from ... referring to [Complainant] in a manner suggestive of [Petitioner's] guilt."

### B.

Petitioner challenges only Respondent's use of the term. In *Jackson v. State*, the Supreme Court of Delaware stated that "the word 'victim' should not be used in a case where the commission of a crime is in dispute." 600 A.2d at 24. That court stated, however, that because the defendant failed to object to the prosecution's use of the word, the defendant was required to establish plain error. *Jackson v. State* held that plain error was not committed because such use "occurred during the direct examination of a police officer and F.B.I. hair expert," and to law enforcement officers, the term "victim" "is a term of art synonymous with 'complaining witness.' " *Id.* at 24–25.

However, in *Nomura*, the ICA stated that "the term 'victim' is conclusive in nature and connotes a predetermination that the person referred to had in fact been wronged." 79 Hawai'i at 416, 903 P.2d at 721. There, one of the jury instructions referred to the complaining witness as "the victim." *Id. Nomura* concluded that, because "the question of whether [the complaining witness] had been abused was a question yet to be decided by the jury," it was improper to refer to her as "the victim." *Id.*

▪ The instant case does not involve the use of the term "victim" in the jury instructions. However, *Nomura* also found the jury

instruction problematic because the trial court must instruct the jury on the law but may not comment upon the evidence. *Id.* at 417, 903 P.2d at 722. Nomura explained that such a rule derives from the principle that the trial judge must endeavor at all times to maintain an attitude of fairness and impartiality. *Id.* The use of the term was also wrong in light of this principle, because the trial court could have used the term "complaining witness" or referred to her by name to avoid the appearance of partiality. *Id.* at 416–17, 903 P.2d at 721–22. The presumption of innocence and the maintenance of fairness and impartiality during the trial are precepts underlying *Nomura*. Hence, the court erred in allowing Respondent and the witnesses to refer to Complainant as "the victim."

### C.

Contrary to the conclusion of the Supreme Court of Delaware, see *Jackson v. State*, 600 A.2d at 24–25, it is not evident that police officers generally use the term "victim" to refer to a complaining witnesses in police reports or when otherwise referring to a person making a complaint against another person. It would seem, in light of *Nomura*, that unless there are good reasons found by the court for permitting otherwise, the court should instruct all counsel that they and their witnesses must refrain from using the term.

▪ Notwithstanding the court's error, the use of the term "victim" in the limited circumstances of this case was not prejudicial to Petitioner and, hence, does not itself warrant reversal of his convictions. *See Nomura*, 79 Hawai'i at 416, 903 P.2d at 721–22. However, it "is incompatible with the presumption of innocence for the prosecution to refer to the complaining witness as the 'victim,' just as it is to refer to the defendant as a 'criminal.' " *Jackson v. State*, 600 A.2d at 21 (motion for clarification). Thus, on remand, this admonition should be heeded.

### XIII.

▪ We reach Petitioner's fifth question, because this is an issue that may recur with

respect to counts one and two and may have affected the sentences on counts three and four. During the sentencing hearing on October 13, 2010, Respondent referenced *State v. Vinhaca,* 124 Hawai'i 128, 237 P.3d 1194 (2010). The court acknowledged that it had presided over the *Vinhaca* case and Petitioner was "in the same category."

> This Court presided over [*Vinhaca*] and did, in fact, sentence the defendant in that case to consecutive sentencing.... [Petitioner], given this Court's familiarity with the *Vinhaca* case and your case, *this Court places you in the same category as Mr. Vinhaca in terms of the need for consecutive sentencing.*

(Emphasis added.) During the discussion of the *Vinhaca* case, Petitioner's counsel stated he did not know about the case. As recounted, the ICA concluded that the court did not err in comparing Petitioner's crimes to Vinhaca's crimes or in imposing an extended sentence, because (HRS) § 706-606(4) allows the court to consider other defendants in similar positions when imposing a sentence, insofar as it directs the court to consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Mundon II,* 2012 WL 1473433, at *5 (quoting HRS § 706-606(4)).

However, it is assumed that the sentencing considerations concerning Vinhaca were an essential part of Vinhaca's pre-sentence report and were used by the court in sentencing Vinhaca. *See* HRS § 706-601(1) ("[T]he court shall order a pre-sentence correctional

diagnosis and accord due consideration to a written report of the diagnosis before imposing sentence."); *see also* HRS § 706-602(1) (requiring the pre-sentence report to set forth, *inter alia,* the circumstances surrounding the crime, the defendant's criminal history, and the effect of the crime on the victim). That pre-sentence report was also available, presumably, to Respondent. However, such information was not available to Petitioner in his own case, nor should it have been. *See* HRS § 806-73(b)(3) [38] (limiting the distribution of pre-sentence reports); *see also State v. Hussein,* 122 Hawai'i 495, 523, 229 P.3d 313, 341 (2010) ("Under HRS § 806-73, then, the [pre-sentence reports] are manifestly subject to restricted dissemination, and are not to be made available for all to use.") (citations omitted). Yet, Petitioner is entitled to " 'have access to all factual information used in sentencing.' " *State v. Durham,* 125 Hawai'i 114, 122, 254 P.3d 425, 433 (2011) (quoting *State v. Paaaina,* 67 Haw. 408, 411, 689 P.2d 754, 757 (1984)).

Inasmuch as the court apparently relied on sentencing information in the *Vinhaca* case, none of which was available to Petitioner, the court erred in imposing a consecutive sentence based on the court's "familiarity with that case." The court cannot base its sentence on information not available to the defendant. Thus, under the circumstances, the consideration by the court of a specific individual as a measuring standard for sentencing Petitioner was in error. Moreover, it does not appear that the conduct involved in

---

**38.** HRS § 806-73 provides in relevant part as follows:

> **§ 806-73 Duties and Powers of Probation Officers, Adult Probation Records**
> ...
> (b) All adult probation records shall be confidential and shall not be deemed to be public records. As used in this section, the term *"records" includes but is not limited to all records made by any adult probation officer in the course of performing the probation officer's official duties.* The records, or the content of the records, shall be divulged only as follows:
> (3) *A copy of a presentence report or investigative report shall be provided only to:*
> (A) The persons or entities named in section 706-604;
> (B) The Hawai'i paroling authority;

> (C) Any psychiatrist, psychologist, or other treatment practitioner who is treating the defendant pursuant to a court order or parole order for that treatment;
> (D) The intake service centers;
> (E) In accordance with applicable law, persons or entities doing research; and
> (F) Any Hawai'i state adult probation officer or adult probation officer of another state or federal jurisdiction who:
> (i) Is engaged in the supervision of a defendant or offender convicted and sentenced in the courts of Hawai'i; or
> (ii) Is engaged in the preparation of a report for a court regarding a defendant or offender convicted and sentenced in the courts of Hawai'i.
> (Emphases added.)

*Vinhaca* was similar to Petitioner's case.[39]

■■■ The ICA did state that the court considered other matters.[40] However, it cannot be said that the court's error in relying on *Vinhaca* was harmless. Here, the court "presided over the [*Vinhaca*] trial and did, in fact, sentence the defendant in that case to consecutive sentencing." To reiterate, when sentencing Petitioner, the court indicated that "given this [c]ourt's familiarity with the Vinhaca case and [Petitioner's] case, this [c]ourt places [Petitioner] in the same category as Mr. Vinhaca in terms of the need for consecutive sentencing." The court acknowledged that it had not imposed consecutive sentencing on all "other defendants who have come before [the court] with ... similar types of crimes to be sentenced[,]" but that it felt that Petitioner deserved consecutive sentencing based on his similarity to Vinhaca. Inasmuch as we vacate the convictions in counts one and two, the sentences therein are also vacated; although, as noted, we answer Petitioner's fifth question because the issue may recur. Moreover, with respect to the convictions on counts three and

four, which we affirm, there is a reasonable possibility that the error in relying on the *Vinhaca* case, might have contributed to Petitioner's sentences in counts three and four. Accordingly, we vacate the sentences in those counts.

## XIV.

For the reasons stated, we (1) vacate Petitioner's convictions as to Count 1, Attempted Sexual Assault in the First Degree, and Count 2, Kidnapping; (2) affirm Petitioner's convictions as to Count 3, Assault in the Third Degree, and Count 4, Assault in the Third Degree; and (3) vacate Petitioner's sentence in Counts 3 and 4. We remand the case to the court for a new trial on Counts 1 and 2 and for resentencing on Counts 3 and 4.

---

**39.** As Petitioner observes, in *Vinhaca*, there were "more victims [two], who were younger [minors] and more closely related to [defendant] [biological daughters]." Vinhaca's offenses "were greater in number, more intrusive and occurred over a longer period of time." Petitioner argues that "[t]he only apparent similarities are conviction for sex offense[s] and [the] Sentencing Judge."

**40.** The ICA noted that the court reviewed the overall facts of the kidnapping/sexual assault incident; Petitioner's history of criminali-

ty, including the fact that he committed the subject offenses while still on probation for an assault conviction; that previous rehabilitation efforts have not been effective; that Petitioner has not taken responsibility for his failure while on probation; that Petitioner preyed on Complainant's vulnerability; and Petitioner's attempts to minimize the fact that he merely subjected his wife, as opposed to someone in the community at large, to acts of abuse. *Mundon II*, 2012 WL 1473433, at *5.